FIFTH DIVISION

March 30, 2001 

 

No. 1-99-2566

WESTCHESTER FIRE INSURANCE CO., ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County. 

) 

)

v. ) No. 97 CH 6935

)

) 

G. HEILEMAN BREWING COMPANY, INC., ) The Honorable

) Michael B. Getty,

Defendant-Appellee. ) Judge Presiding 

MODIFIED OPINION UPON DENIAL OF REHEARING

Justice Greiman delivered the opinion of the court:

Westchester Fire Insurance Co. (Westchester) filed a declaratory judgment action against G. Heileman Brewing Co. (Heileman), seeking a finding that it had no duty to defend an action filed in California by a number of Heileman distributors.  The trial court granted Heileman's motion for summary judgment.  The court, applying California law, found that Westchester had breached its duty to defend; was obligated to indemnify Heileman for the judgment amount in the underlying action; and was liable for all costs and attorney fees incurred in defending that suit and this declaratory action.  Westchester appeals, arguing that (1) Illinois law applies; (2) it had no duty to defend Heileman in the underlying action; (3) it did not breach its duty to defend; (4) it should not be estopped from denying coverage; (5) Heileman is not entitled to attorney fees and costs incurred prior to tendering the underlying action; (6) Westchester is entitled to a credit for sums recovered by Heileman from another insurer; and (7) Heileman is not entitled to attorney fees and costs incurred in defending this declaratory action.

FACTS

On February 26, 1993, Rausser Distributing Co. and other Heileman distributors filed suit against Heileman, Logret Import & Export Co. (Logret), and Dan McKinney Co.(McKinney) in the United States District Court for the Northern District of California.  The complaint alleged that the plaintiffs entered into a contract with Heileman which granted them the exclusive right to distribute designated Heileman beer products in a defined geographic area.  Count I alleged that defendants violated section 1 of the Sherman Act (15 U.S.C.A. §1 (West 1992)) by conspiring as early as May 1992 to fix the wholesale price of Heileman beer products.  Count II alleged that Heileman violated section 13(d) of the Robinson-Patman Act (15 U.S.C.A.§13(d) (West 1992)) by making "discriminatory payments" to Logret and McKinney for services and facilities they furnished in connection with the processing, handling, and sale of Heileman beer products.  Count III alleged breach of contract; Count IV alleged that Heileman violated section 17043 of the California Unfair Practices Act (Cal. Bus. & Prof. Code §17043 (West 1992)) by selling its beer products below cost to retail stores; Count V alleged intentional interference with the contract; Count VI alleged that Heileman violated section 17045 of the California Unfair Practices Act (Cal. Bus. & Prof. Code §17045 (West 1992)) by making secret discriminatory payments to Logret and McKinney; and Count VII alleged that Heileman violated section 13(a) of the Robinson-Patman Act (15 U.S.C.A. §13(a) (West 1992)) by extending lower prices to Logret and McKinney than the prices extended to the plaintiffs.  Plaintiffs alleged that the complained-of conduct was continuous and ongoing.  Plaintiffs further alleged economic damages caused by the loss of retail store customers, profits associated with sales from those stores, and the diminished fair market value of their exclusive distribution rights.  

Thereafter, on August 5, 1994, Westchester issued a Commercial Umbrella Policy CUA-100126-0 (initial policy) to Hicks, Muse, Tate & Furst, Inc., Heileman's parent company, for the period of April 1, 1994, to April 1, 1995.  The policy named Heileman and over 50 other companies as insureds.  The policy was issued in St. Louis, Missouri.  Westchester's authorized representative was listed as The London Agency, Inc., of Atlanta, Georgia.  On June 6, 1995, Westchester issued a second Commercial Umbrella Policy CUA-101635-0 (renewal policy) to Hicks, Muse for the period of April 1, 1995 to April 1, 1996.  The policy named Heileman and over 100 other companies as insureds.  The policy was issued in Dallas, Texas.  Westchester's authorized representative was listed as Tri-City Brokerage of Illinois, Inc., of Chicago, Illinois.  Some of the companies listed as insureds by the policies were Heileman subsidiaries.  The policies provided that Westchester is licensed to do business in all states. 

The policies provided:

"I.  COVERAGE

We will pay on behalf of the 'Insured' those sums in excess of the 'Retained Limit' which the 'Insured,' by reason of liability imposed by law, or assumed by the "Insured" under contract prior to the 'Occurrence,' shall become legally obligated to pay as damages for *** 'Personal Injury' caused by an offense committed during the 'Policy  Period' ***.

***

II.  DEFENSE SETTLEMENT

(1) We shall have the right and duty to defend any 'Claim' or 'Suit' seeking damages covered under the terms and conditions of this policy when:

(b) Damages are sought for 'Bodily Injury', 'Property Damage', 'Personal Injury', or “Advertising Injury” which are not covered by 'Underlying Insurance' or other insurance."

The policies also contained the following definitions:

"G. 'Occurrence' means:

(1) An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured.'

All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one 'Occurrence.'

(2) An offense that results in 'Personal Injury.'

All damages that arise from exposure to the same act, publication or general conditions are considered to arise from one 'Occurrence.'

*** 

H. 'Personal injury' means injury, other than 'Bodily Injury' and 'Advertising Injury' arising out of *** discrimination."

On February 5, 1996, Westchester filed a declaratory judgment action in the United States District Court for the Northern District of Illinois seeking a determination that it had no obligation to defend or indemnify Heileman in the Rausser action.  On March 22, 1996, Westchester informed Heileman of the federal declaratory action in a letter concerning settlement in an unrelated matter known as the Calumet action.  Attached to the letter was a copy of the federal complaint. On April 3, 1996, Heileman filed for Chapter 11 bankruptcy.  On June 26, 1996, Heileman's bankruptcy plan was approved.

On November 15, 1996, Heileman settled the Rausser lawsuit for $2,568,162.75. 

On April 25, 1997, Westchester voluntarily dismissed the federal suit.  Westchester refiled this declaratory judgment action in the Circuit Court of Cook County on June 4, 1997.  Westchester alleged that at the time the policies were entered into, Heileman either knew or should have known that there was a substantial probability that it would suffer or had already suffered a loss.  Westchester also alleged that it did not receive notice of the Rausser action from Heileman until a letter dated August 16, 1995.  Westchester further alleged that the complained-of conduct did not constitute an occurrence as defined in the policies and, in the alternative, that the occurrence did not occur during the policy periods. 

On September 8, 1998, Westchester filed a motion for summary judgment.  Westchester argued that under Illinois law, the claim asserted in the Rausser complaint was a "known loss" and therefore uninsurable.  Westchester also argued that Heileman's delay in giving notice constituted a breach of the policies and defeated coverage for claims asserted in the Rausser action.

On September 11, 1998, Heileman filed a cross-motion for summary judgment.  Heileman responded that under California law the known loss doctrine as formulated by Heileman was not applicable.  Heileman further alleged that Westchester's late notice defense also failed under California law.  Attached to the motion was the affidavit of Steve Carlson, a former Heileman employee.  The affidavit stated that Heileman was a Delaware corporation with its home office in Wisconsin from August 1990 until Heileman went out of business in July 1996; that Heileman opened an executive office in Illinois in April 1992; that Heileman owned numerous subsidiaries, all of which were Delaware corporations with home offices in Wisconsin; that Heileman used a Missouri insurance broker to procure the policies; that Heileman paid its insurance premiums for the policies in Wisconsin; and that the policies were delivered to Heileman in Wisconsin.  

In its response to Heileman's cross-motion, Westchester argued that even assuming that it had an obligation to indemnify Heileman for the Rausser settlement, it had no obligation to indemnify Heileman for damages incurred prior to August 5, 1994, or defense costs incurred prior to August 16, 1995.

On November 18, 1998, the trial court entered summary judgment in favor of Heileman and against Westchester.  The trial court applied the choice of law test articulated in 
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520 (1995), and found that it did not yield a "definite answer."  Relying on 
Society of Mount Caramel v. National Ben Franklin Insurance Co of Illinois
, 268 Ill. App. 3d 655 (1994), the trial court gave the location of the insured risk special emphasis.  The trial court concluded that the insured risk was located in California because the Rausser action was a California lawsuit brought by California residents alleging misconduct and injuries in California and because the Rausser cause of action arose out of California's statutory scheme which regulates the distribution of beer and other alcoholic beverages.  Accordingly, the trial court applied California law and found that California's known loss doctrine does not bar coverage; that Westchester failed to establish a late-notice defense to bar coverage; that Westchester breached its duty to defend Heileman in the Rausser action; and that Westchester was estopped from raising noncoverage as a defense under the indemnity provisions of the policy.  Westchester was ordered to indemnify Heileman for the amount of the judgment in the Rausser action as well as costs, expenses, and attorney fees incurred by Heileman in defending the suit.  

The trial court denied Westchester's motion for reconsideration, and subsequently entered an agreed final judgment in the amount of $5,093,478.56.  The award included $400,102.52 for costs and fees Heileman incurred in defending this declaratory action, which further provided for interest on the award of attorney's fees at 10 % consistent with California law.  Westchester did not receive credit for a $600,000 payment Heileman received from another insurer.  Westchester filed a timely appeal.  Heileman's motion to strike certain portions of Westchester's reply brief has been taken with the case. 

ANALYSIS

Appeals from summary judgment rulings are reviewed 
de novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90 (1992).  Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  
Purtill v. Hess
, 111 Ill. 2d 229 (1986).  Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt.  
Purtill
, 111 Ill. 2d at 240.

Before reaching the merits of the case, we must first determine which state's law applies.  The Westchester policies do not contain an express choice of law provision.  Therefore, Illinois' choice of law rules will determine the applicable law.  
Diamond State Insurance Co. v. Chester-Jensen Co.
, 243 Ill. App. 3d 471 (1993).  Westchester contends that Illinois law applies because Illinois has the most significant relationship to this dispute; Heileman responds that California law applies because most of the significant contacts occurred there.
(footnote: 1)
 The Illinois choice of law rule for insurance contracts is the "most significant contacts" test.  Pursuant to this test, insurance policy provisions are “governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract."  
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520, 526-27 (1995), quoting 
Hofeld v. Nationwide Life Insurance Co.
, 59 Ill. 2d 522 (1975).  The 
Lapham-Hickey
 factors should be evaluated in light of the relevant policies of the forum and other interested states, as well as those states’ interest in the issue.  
Diamond State
, 243 Ill. App. 3d at 486.  See also Restatement (Second) of Conflict of Laws §6(2) (1969).    

The most significant contacts test is similar to the "most significant relationship" choice of law test in section 188 of the Restatement (Second) of Conflicts of Laws, which is applied to tort claims.  Restatement (Second) of Conflict of Laws, §188 (1969).  Contrary to Westchester's contention, 
Lapham-Hickey
 did not adopt the most significant relationship test.  But see 
Lyons v. Turner Construction Co.
, 195 Ill. App. 3d 36 (1990) (finding that Illinois courts have adopted the section 188 analysis when determining which state law should be applied).  
Lapham-Hickey
 involved an insurance policy obtained by an Illinois company that covered property in six different states.  The insured sought a declaration regarding its right to recover defense costs associated with EPA proceedings relative to Minnesota property insured under the policy.  The Illinois Supreme Court applied the substantive law of Illinois in order to obtain a consistent interpretation of the policy.  The Court gave little weight to the fact that the property was located in Minnesota.  Instead, the Court relied on the fact that the policy was delivered to Lapham-Hickey in Illinois, that Lapham-Hickey was incorporated in Illinois, and that the insurer was licensed to do business in Illinois.  
Lapham-Hickey
, 166 Ill. 2d at 527.

Here, the trial court correctly found that many of the 
Lapham-Hickey
 factors do not yield a definitive result.  The Carlson affidavit establishes that the location of the last act giving rise to an enforceable contract was Wisconsin, as that is where the insurance policies were delivered to Heileman.  The initial policy directed the insureds to refer problems or complaints to its company representative, The London Agency, which was located in Georgia.  A Missouri brokerage company was used for both policies. 

However, we agree with Westchester that Illinois has more contacts to the instant dispute than any other state.  The representative listed in the renewal policy was located in Illinois, and Westchester is licensed to do business in Illinois.  More importantly, Heileman's principal place of business was in Illinois and not Wisconsin.  Heileman admitted as much in an unrelated 1995 federal complaint filed in the Northern District of Illinois.  Heileman contends that it made that allegation because for purposes of federal diversity jurisdiction, a corporation is deemed to be a citizen of any state in which it has been incorporated and of the state where it has its principal place of business. 28 U.S.C.A. § 1332(c)(1) (West 1998).  The Seventh Circuit defines principal place of business as the place where a corporation has its "nerve center."  
Krueger v. Amercian States Insurance Co.
, 996 F.2d 928 (7th
 Cir. 1993).  The nerve center test focuses on the location of decision making as opposed to the volume of activity at various locations.  Thus, a corporation has a single principal place of business where its executive headquarters are located.  
Metropolitan Life Insurance Co. v. Estate of Cammon
, 929 F.2d 1220 (7th Cir.1991).  Illinois courts determine an entity’s principal place of business by looking at the location of the offices responsible for the main activities of the entity; the location where the business of the entity is carried out; the location of business decision making; the residences of trustees and beneficiaries; and the “nerve center” of the entity.  
Illinois Life & Health Insurance Guaranty Assoc. v. Boozell
, 289 Ill. App. 3d 621 (1997).  The Carlson affidavit states that in 1992, Heileman opened an executive office in Rosemont, Illinois, and that 14 of its 27 executive officers relocated to that office.  There is not enough information in the record to determine whether Heileman's place of business was in Georgia or New York.  In any event, this determination is neutral to our choice of law analysis.

The fact that the Rausser action was filed in a California federal district court is not dispositive to our analysis.  See 
Zurich Insurance Co. v. Sunclipse, Inc.
, 85 F. Supp. 2d 842 (N.D. Ill. 2000) (finding that the place of the underlying suit cannot be equated with the location of the subject matter or insured risk).  
The location of the underlying action can, however, be considered as an additional relevant factor.  See 
Society of Mount Carmel
, 268 Ill. App. 3d at 665.  Nonetheless, we agree with Westchester that the location of the risk has little or no significance to our analysis because the policies covered risks nationwide and did not specifically state the location of the risk.  

Section 193 establishes instances where the location of the subject matter should be given more weight than the other 
Lapham-Hickey
 factors:

“The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local laws of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in 6 to the transaction and the parties, in which event the local law of the other state will be applied.”  Restatement (Second) of Conflict of Laws §193 (1969). 

The commentary to this section further states:

"The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state.  Situations where this cannot be done, and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states." Restatement (Second) of Conflict of Laws §193, comment b, at 611 (1969).

In 
Society of Mount Caramel
, t
he insured alleged that its insurer failed to defend it in a California lawsuit arising from acts committed in California.  The comprehensive general liability (CGL) policy was executed in Illinois and covered multiple risks located in several states.  The court, citing section 193, gave the location of the insured risk special emphasis and determined that "the insured risk involved in this instance" (the high school) was located in California.  
Society of Mount Carmel
, 268 Ill. App. 3d at 664-65.  The court also noted that the underlying plaintiff was a California resident and that the underlying action was brought in a California court against defendants who were predominately domiciled in California.  Accordingly, the court applied California law.  
Society of Mount Caramel
, 268 Ill. App. 3d at 664-65.  
Society of Mount Carmel
 has been interpreted as holding that the location of the insured risk is the place where the insured’s liability actually arises.  See, 
e.g.
, 
American Builders & Contractors Supply Co., Inc. v. The Home Insurance Co.
, No. 96 C 5041 (N.D. Ill. January 28, 1997) (finding that where the insured company conducts business nationwide, Illinois law provides that the location of the insured risk is the place where the insured's liability actually arises).  
However, we find it significant that the defendant high school was listed in the policy as one of the covered hazards.  See 
Alliance General Insurance Co. v. Covington Enterprises, Inc.
, No. 99-2585, slip op. at __, (7th Cir. July 12, 2000), citing 
Evangelical Lutheran Church in America v. Atlantic Mutual Insurance Co.
, 169 F.3d 947 (5th
 Cir. 1999) (noting that each of the risks was discrete and could be identified with a specific state).

Westchester contends that the location of the insured risk is too difficult to define in the context of a CGL policy covering a company that does business nationwide.  
Westchester further contends that the "risk" is the risk insured at the time the parties enter into the insurance contract rather than any subsequent event giving rise to liability.  For example, in 
Employers Insurance of Wausau v. Ehlco Liquidating Trust
, 309 Ill. App. 3d 730 (
1999),
 the policies covered risks located in more than one state.  The policies listed 24 states where the insured or its subsidiary did business or had operations.  The court held that the location of the property against whom the lawsuit was filed was entitled to little weight and could not be a determinative factor in choosing the state that had the closest relationship.
  
Employers Insurance
, 309 Ill. App. 3d at 740.

The facts in the instant case are more analogous to 
Employers Insurance
 than to 
Society of Mount Carmel
.  The insured risk is the liability arising from Heileman's commercial activities.  The Carlson affidavit establishes that Heileman had several breweries located throughout the United States.  Although the insurance policies do not list the individual states where Heileman operated, the insured risk could occur in any state where Heileman conducted its business.  The policies apparently provided general liability insurance for Heileman everywhere it did business, and Westchester could presumably handle claims from any of its offices nationwide.  As in 
Lapham-Hickey
, the risks insured under the instant policies were located in several different states and countries.  The policies were apparently designed to provide coverage without regard to location of risks.  We find that t
he risk cannot be located "at least principally in a single state."  Therefore, the trial court erred in emphasizing the location of risk over the other 
Lapham-Hickey
 factors. 

We reject Heileman's argument that a Texas amendatory endorsement in the renewal policy demonstrates that Westchester intended for the law of the place of the occurrence to control its duties.  The endorsement provided that Texas law controls Westchester's duties to pay and handle claims if the occurrence takes place in Texas.  The endorsement did not state that Texas law applies to any coverage dispute arising out of any occurrence in Texas, but merely changed some of Westchester's duties for occurrences that take place in Texas.

We now address whether Westchester owed Heileman a duty to defend.  An insurer's duty to defend is much broader than its duty to indemnify.  
Conway v. Country Casualty Insurance Co.
, 92 Ill. 2d 388 (1982).  To determine whether an insurer has a duty to defend its insured, the court must consider the allegations in the underlying complaint and compare them to the relevant provisions of the insurance policy.  
United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.
, 144 Ill. 2d 64 (1991).  If the court determines that these allegations fall within or potentially within the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint.  
Wilkin
, 144 Ill. 2d at 73.  The underlying complaint must be construed liberally so that all doubts are resolved in favor of the insured.  
Wilkin
, 144 Ill. 2d at 74.  

Westchester does not dispute that Rausser falls within the scope of its coverage for discrimination.  Instead, Westchester argues that Heileman is not entitled to summary judgment as a matter of law because Heileman failed to satisfy its burden of showing that personal injury occurred during the policy periods.  The trial court found that "the Rausser complaint alleges on-going and continuous discrimination, beginning in May 1992 and continuing until at least June 1996."  The Carlson affidavit stated that Heileman implemented its "California Plan" from May 1992 through at least June 1996.  Clearly, the Rausser complaint alleged conduct during the effective dates of the policies.  
Accordingly, we find that Westchester had a duty to defend Heileman.

However, Westchester asserts that it did not breach that duty because it filed a timely declaratory judgment action and, therefore, should not be estopped from asserting coverage defenses
.  In Illinois, when a complaint against an insured alleges facts potentially within the scope of the policy coverage, an insurer who disputes its duty to defend must either seek a declaratory judgment that there is no coverage or defend the action under a reservation of rights.  
State Farm Fire & Casualty Co. v. Martin
, 186 Ill. 2d 367 (1999) (citations omitted).  If an insurer fails to take either course of action and a duty to defend exists, it will be estopped from later raising coverage defenses.  
Clemmons v. Travelers Insurance Co.
, 88 Ill. 2d 469 (1981).  In 
State Farm
, our supreme court rejected the argument that an insurance company should be required to actually 
secure
 a declaratory judgment or defend under a reservation of rights.  
State Farm
, 186 Ill. 2d at 373-74.  The Court reasoned that such a rule would render the declaratory judgment option illusory.  
State Farm
, 186 Ill. 2d at 373.  However, an insurer cannot avoid estoppel by seeking a declaratory judgment at its leisure.  
Providence Hospital v. Rollins Burdick Hunter of Illinois, Inc.
, 824 F. Supp. 131 (N.D. Ill. 1993).  "[A] liability insurer in doubt over whether to defend its insured, cannot simply stand on the sidelines and wait until the tort action is complete before contesting the question of coverage."  
Reis v. Aetna Casualty & Surety Co.
, 69 Ill. App. 3d 777, 782 (1978). 

In 
Unigard Insurance Co. v. Whitso, Inc.
, 195 Ill. App. 3d 740 (1990), the court found that a CGL insurer was not estopped from raising a policy defense where it filed a declaratory judgment action four months after receiving notice of a claim and three months before the underlying action was settled.  In 
Central Mutual Insurance Co. v. Kammerling
, 212 Ill. App. 3d 744 (1991), the court found that the insurer was estopped from asserting its coverage defenses where it filed a declaratory action ten months after it received notice of the underlying claim and several months after it had notice of a potential settlement of the underlying action.  
"[T]he most important factor *** is not the raw chronological delay in an insurer's filing a declaratory judgment action, but whether the insurer waited until trial or settlement was imminent."  
Providence Hospital v. Rollins Burdick Hunter of Illinois, Inc.
, 824 F. Supp. 131, 136 (N.D. Ill. 1993) (finding that insurer was not estopped from claiming noncoverage where it filed a declaratory judgment action over one year after denying coverage because the trial of the underlying case was several months away and the settlement was not an option at the time the declaratory action was filed).  Thus, the time period between notice of an underlying action and filing of a declaratory judgment action is not determinative of whether estoppel applies.

The facts of the instant case are similar to those in 
Unigard
.  Westchester did not defend Heileman under a reservation of rights.  Instead, Westchester filed its federal declaratory action six months after receiving notice from Heileman and fifteen months before the Rausser settlement.  The trial court erroneously relied on the fact that Westchester filed its state declaratory judgment action 21 months after it received notice of the Rausser action.  Illinois law does not distinguish between the filing of a federal and state declaratory judgment action for purposes of estoppel.  Therefore, we find that Westchester properly exercised one of its options under Illinois law and is not estopped from raising its coverage defenses.

Westchester next asserts that the loss arising out of the Rausser action is an uninsurable, known loss.  The known loss, or loss-in-progress, doctrine is designed to protect against contingent or unknown risks of harm.  In Illinois, the known loss doctrine may be invoked when the insured knew or had reason to know that there was a substantial probability that loss or liability would result from the conduct for which it seeks coverage.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90 (1992).  See also 
St. Paul Fire & Marine Insurance Co. v. Lefton Iron & Metal Co., Inc
., 296 Ill. App. 3d 475 (1998); 
Missouri Pacific Railroad Co. v. American Home Assurance Co.
, 286 Ill. App. 3d 305 (1997).  

In 
Outboard
, the insured filed a declaratory judgment action against its CGL insurers, alleging that the primary insurers breached their duty to defend against suits filed by governmental agencies for water pollution from the insured's facility.  The policy was issued after the insured received an administrative order from the Environmental Protection Agency confirming the contamination.  The insurers argued that the contamination constituted a known loss because the insured had knowledge that it was releasing hazardous material into the environment.  The Illinois Supreme Court held that the letter gave the insured knowledge of a substantial probability that contamination claims would be made against it.  
Outboard Marine
, 154 Ill. 2d at 106.  The Court determined that an insurer is not required to prove that its insured knew the exact extent of its liability.  
Outboard Marine
, 154 Ill. 2d at 107.  Here, a lawsuit requesting millions of dollars in damages was pending at the time the initial policy was issued.  In fact, the Rausser action was filed more than a year prior to the initial policy.  Heileman knew or had reason to know that there was a substantial probability that it would sustain a loss or liability in the Rausser action. 

Heileman asserts that Illinois' known loss doctrine conflicts with the public policy of California as expressed in
 
Montrose Chemical Corp. of California v. Admiral Insurance Co.
, 913 P.2d 878, 42 Cal. Rptr. 2d 324 (Cal. 1995).  
We disagree.  In 
Montrose
, an insured chemical company sought a declaration that its comprehensive general liability insurer had a duty to defend and indemnify it in underlying actions alleging continuous or progressively deteriorating bodily injury and property damage as a result of the insured’s disposal of toxic waste.  The California Supreme Court held that there was an insurable risk for which coverage may be obtained under a third party policy because it had yet to be established, at the time the insurer entered into the contract with the policyholder, that the insured had a legal obligation to pay damages to a third party in connection with a loss.  
Montros
e, 913 P.2d at 905-906.

Montrose
 does not apply to a situation where, as here, a lawsuit is filed against the insured prior to the policy period, the insured does not disclose the lawsuit, and the insured allegedly continues engaging in the wrongful conduct after the suit is filed and into the policy period.  
We find 
Franklin v. Fugro-McClelland (Southwest) Inc.
, 16 F. Supp. 3d 732 (S.D. Tex. 1997), to be persuasive.  In 
Franklin
, excess liability insurers sought a declaratory judgment that the loss-in-progress doctrine precluded coverage for a patent infringement that began prior to the effective date of the policy.  The alleged wrongful conduct began in either 1991 or 1992, and that the insurance policy was not purchased until 1993.  The court held that Texas' loss-in-progress precluded coverage for the claims.  
Franklin
, 16 F. Supp. 2d at 737.  The
 court distinguished 
Montrose
 by noting that the hazardous waste disposal was committed long before the insured entered into the policies, and that the resulting damage occurred from the waste's progressive leakage into the soil rather than from any ongoing voluntary actions taken by the insured.  The court stated:

"[t]he loss-in-progress doctrine was designed for cases just like the one before the Court and is based on equitable principles.  The doctrine precludes a party from voluntarily engaging in an activity that gives rise to an accusation of wrongdoing and potential legal liability, and then purchasing insurance so that it may shift financial responsibility for its conduct and then continue to engage in the offending activity." 

Franklin
, 16 F. Supp. 3d at 736.

Westchester also argues that coverage is precluded because Heileman tendered late notice of the Rausser claim.  
Westchester contends that it did not know of the Rausser action when Heileman purchased the initial policy.  Heileman does not contend that it informed Westchester of the lawsuit. Instead, it maintains that Westchester was aware of the lawsuit at the time the initial policy was entered into because the case was "national news."  Heileman cites to three news articles in its brief as support but does not ask this court to take judicial notice of them.  In any event, the insurance application is not contained within the record.  Therefore, we need not reach this issue. 

We next address whether Westchester has a duty to indemnify.  
An insurer's duty to indemnify is narrower than its duty to defend.  
Conway
, 92 Ill. 2d at 394.  The duty to indemnify arises only when the insured becomes legally obligated for a judgment in the underlying action. 
 
Zurich Insurance Co. v. Raymark Industries, Inc.
, 118 Ill. 2d 23 (1987).  As we have found that Heileman's actions were in violation of the known loss and loss in progress doctrines, Westchester is not obligated to reimburse Heileman for the Rausser settlement.  Therefore, Westchester's argument that the judgment should be reduced by $600,000 in order to reflect the amount Heielman received in a settlement with another insurer is moot.

Westchester also disputes the reasonableness of defense costs incurred by Heileman in the Rausser action.  A trial court's award of attorney fees will not be overturned absent an abuse of discretion.  
International Insurance Co. v. Rollprint Packaging Products, Inc.
, No. 1-98-2381 (March 31, 2000).  The Carlson affidavit states that Heileman spent $1,056,479.08 defending against Rausser.  The trial court found these fees to be reasonable.  The trial court set the matter for prove up so that Westchester could present evidence as to whether the settlement, costs, or fees were so unreasonable as to shock the court's conscience.  No hearing was held, however, because the parties entered into a stipulation.  There is no evidence in the record or the parties' arguments that the trial court "failed to review the evidence submitted or to consider the relevant factors or that it abused its discretion in any way in reaching the award."  See 
International Insurance
, No. 1-98-2381, *10.  

Westchester next asserts that Heileman is not entitled to defense costs it incurred prior to giving Westchester notice of the Rausser action.  Westchester relies on the "voluntary payment" clause contained in the policies, which provides that "[n]o 'Insureds' will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent."  A voluntary payment provision provides that an insurer will not be held liable for expenses voluntarily incurred by an insured before tendering defense of a suit to the insurer.  See 
Faust v. The Travelers
, 55 F.3d 471 (9th Cir. 1995).  The purpose of this clause is to prevent collusion between the insured and the injured party.  
Pittway Corp. v. American Motorists Insurance Co.
, 56 Ill. App. 3d 338 (1977).  An insurer seeking to avoid responsibility because of a breach of this clause must show prejudice.  
Pittway
, 56 Ill. App. 3d at 346. In the present case, Heileman had been defending against the Rausser complaint for more than a year prior to the Westchester policy becoming effective and Heileman did not give notice of the suit to Westchester until almost 2 1/2 years after it was filed.  Heileman's violation of the known loss doctrine in obtaining the policies in question certainly prejudiced Westchester.  Therefore, we agree with Westchester's position that Heileman is not entitled to defense costs it incurred prior to giving Westchester notice of the Rausser action.

Westchester next asserts that Heileman is not entitled to attorney fees it incurred in defending against this declaratory action.  In its final judgment, the trial court found that Heileman spent "at least $400,102.52 for declaratory action fees and costs in this matter through June 15, 1999."  Absent vexatious behavior by the insurer, an insured cannot recover attorney fees incurred in bringing a declaratory judgment action against the insurer to establish coverage.  Nor can
 an insured recover attorney fees and costs for defending a declaratory judgment action brought by an insurer absent vexatiousness.  
Brotherhood Mutual Insurance Co. v. Roseth
, 177 Ill. App. 3d 443 (1988).  This principle is in accord with the well-established rule that a successful party in a lawsuit is not entitled to attorney fees absent statute or agreement.  See 
Kerns v. Engelke
, 76 Ill. 2d. 154 (1979). 

Section 155 of the Illinois Insurance Code allows for the imposition of a penalty against an insurer whose refusal to defend is found to be vexatious and unreasonable:

"(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts ***."  215 ILCS 5/155 (West 1992).

There was no finding below that Westchester acted vexatiously in its denial of coverage, and Heileman does not now make such an argument.   The fact that we have found that Westchester's filing of its federal declaratory action comported with Illinois law and have reversed the trial court's judgment entered to Heileman conclusively shows that Westchester's actions in denying coverage were not vexatious and unreasonable.  
O'Rourke v. Access Health, Inc.
, 282 Ill. App. 3d 394, 406 (1996), appeal denied, 168 Ill. 2d 599.  Therefore, Heileman is not entitled to attorney fees incurred in defending against this declaratory action.

For the foregoing reasons, we affirm the trial court's ruling that Westchester had a duty to defend Heileman in the Rausser action, but reverse the trial court's ruling that Westchester breached that duty and must indemnify Heileman for the amount of the Rausser settlement.  We also reverse the trial court's finding that Heileman must be reimbursed for costs and attorney fees incurred in defending the Rausser action prior to giving notice to Westchester and remand to the trial court for further proceedings consistent with our findings.  We note that prejudgment interest on the costs and attorney fees incurred after providing notice should be awarded at a 5% rate to reflect our finding that Illinois law applies.  We also reverse the trial court's finding that Westchester must reimburse Heileman for costs and attorney fees incurred in defending this action, and remand to the trial court for further proceedings consistent with our findings.  Heileman's motion to strike certain portions of Westchester's reply brief is denied.

Affirmed in part; reversed in part and remanded with directions.

QUINN, P.J., and THEIS, J., concur.

FOOTNOTES
1: 
Although the parties confine their arguments to Illinois and California law, they conceded during oral argument that we could apply the law of a different state altogether if required by Illinois choice of law principles; i.e., Wisconsin.