In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 12-1821

NAUTILUS INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

BOARD OF DIRECTORS OF REGAL LOFTS
CONDOMINIUM ASSOCIATION,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 425 — **William J. Hibbler**, *Judge.*

---

ARGUED NOVEMBER 4, 2013 — DECIDED AUGUST 21, 2014

---

Before EASTERBROOK, KANNE, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. A condominium board, Regal Lofts Condominium Association, appeals the grant of summary judgment in a declaratory judgment action filed by Nautilus Insurance Company. The condominium board argues that water damage to individual units, the product of poor construction by the developer, should be covered by policies issued to the developer by the Nautilus. We review the policy

language in question and find that the developer's shoddy workmanship, of which the condominium board complains, was not covered by the developer's Nautilus policies; that the insurance company did not unduly delay in pursuing this declaratory suit; and that the alleged damage to residents' personal property occurred after the portions of the building in question were excluded from the scope of coverage.

**I**

In 1998, a group of individuals and corporations formed a limited liability company, 1735 W. Diversey, LLC ("Developer"), to renovate a vacant building in Chicago. (Among those who formed the Developer were individuals Ronald Shipka, Sr., Ronald Shipka, Jr., and John Shipka, who were also named as insureds in the Developer's various insurance policies. Because the fates of the individuals in this matter run with that of the company, we'll refer to all insureds collectively as the Developer.)

As was evident from the Developer's name, it intended to convert a vacant building located at 1735 West Diversey Parkway into a condominium called the Regal Lofts. It did so, gutting completely the five-story building and refitting it with residential units. In connection with this renovation, the Developer purchased two Commercial Lines Policies from Nautilus Insurance Company. The first policy covered the period from June 1998 through June 1999, and the second, June 1999 to June 2000. These policies' scope of coverage takes center stage in the present litigation.

## A

The two insurance policies in question, identical for all purposes of this litigation, cover bodily injury and property damage liability under the following provisions:

1. **Insuring Agreement.**
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seek those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. …
   b. This insurance applies to "bodily injury" and "property damages" only if:
      (1) The "bodily injury" or "property damage" is caused by an "occurrence" …; and
      (2) The "bodily injury" or "property damage" occurs during the policy period.

"Property Damage" encompasses

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time

> of the physical injury that caused it;
> or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

An "occurrence" is defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Neither policy defines what constitutes an "accident."

The policies contain three exclusions that are relevant to this matter. First, the policies exclude property damage to "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." Another exclusion takes out of the scope of coverage property damage to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." Lastly, both policies contain an endorsement entitled "Exclusion—Products-Completed Operations Hazard." As the name may suggest, this endorsement provides that "[t]his insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard,'" a term that is structured slightly differently in the two policies, despite reflecting identical content. Both policies define that the exclusion encompasses "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) Products that are still in your

physical possession; or (2) Work that has not yet been completed or abandoned." Relatedly, the policies provide that

"Your work" will be deemed completed at the earliest of the following times:

> (1) When all of the work called for in your contract has been completed,
> (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site, or
> (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

In addition, the policies state that "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

**B**

The construction of Regal Lofts was completed in 2000. The Regal Lofts Condominium Association ("the Board") was formed to govern the common areas of the building, and on July 27, 2000, the Developer transferred control of the condo association to an elected board of individual unit owners, though it still owned eleven units. As early as May 2000, however, one homeowner was aware of water damage issues in the building. In November 2000, another homeowner complained that water had been leaking into his unit—whenever it rained—for at least two months. In 2005, the Board hired a building consulting firm to survey the building and investigate the cause of the leakage. The firm

noted that the exterior brick masonry walls were not fully waterproofed, as evidenced by water leakage, buildup of efflorescence in the interior surfaces of the brick walls, and spalling (breaks and cracks) in some of the walls. The consulting firm concluded that the deteriorated conditions had likely developed over many years, even prior to the condominium conversion, but that the present water penetration was the result of inadequate restoration of the walls to a water-tight, serviceable condition.

Thus began a cascading series of litigation. In January 2008, the Board sued the Developer in Illinois state court on behalf of the individual homeowners. (We will call this the "underlying action" or the "state court action.") The six-count complaint alleged, *inter alia*, that the Developer had failed to properly construct the exterior walls and that the structural defects required rebuilding or repair. Shortly after this suit was first filed, the Developer tendered the matter to Nautilus and requested that the insurance company indemnify the Developer and defend against the lawsuit. Nautilus denied coverage under both policies. In June 2008, the Board amended its initial complaint to add a count of negligence; the Developer tendered this amended complaint, but Nautilus again denied coverage. In August 2009, the Board again amended the complaint to detail with more specificity the Developer's alleged negligence. This second amended complaint was the first time that the Board alleged that the Developer's negligence had caused damages to personal property within the building, in addition to the interior of the building and the building itself. The Developer once again tendered this complaint to Nautilus, requesting coverage.

Alas, the third time was not quite the charm. In lieu of accepting the matter, Nautilus filed this declaratory judgment action against the Developer and the Board in Illinois federal court. In its answer to Nautilus's complaint, the Developer asserted several affirmative defenses, including estoppel, and brought a counterclaim against Nautilus, claiming that it had breached its duty to defend the Developer in the underlying action. The Developer then filed a motion for summary judgment in October 2010.

The district court denied this motion on several grounds. First, it held that the initial complaint and first amended complaint in the state court action did not give rise to a duty to defend by Nautilus, because in order for a construction defect to be classified as an "occurrence" under Illinois law, it must damage something other than the project itself. The first two iterations for the Board's complaint alleged only damage to the building itself, and so it was only with the second amended complaint in the underlying action—alleging, for the first time, damages to personal property—that the matter could have been potentially within the scope of the policies' coverage. However, the district court held that Nautilus correctly argued that the products-completed operations hazard exclusion applied to the personal property damage alleged in the second amended complaint.

Meanwhile, in June 2011, the Board settled its claim with the Developer in the underlying action, and the Developer assigned to the Board all rights against Nautilus. The Board thus stepped in to contest Nautilus's motion for summary judgment, and, eventually, to pursue this appeal.

In March 2012, the district court granted summary judgment in favor of Nautilus. The grant of summary judgment

turned on the same questions of law as were implicated in the district court's denial of the Developer's summary judgment motion: in both decisions, the court held that the water damage at question in the underlying action was not an "occurrence" under Nautilus's policies, because Illinois law interpreting insurance contracts provides that damage to a construction project resulting from faulty workmanship is not an "accident." It also held that the products-completed operation hazard exclusion clearly applied to the personal property damage alleged in the second amended complaint, and that there was no genuine issue of material fact regarding this issue. Given these facts, the district court concluded that Nautilus had no duty to defend or indemnify the Developer in the state court matter. The Board timely appealed.

## II

"We review the district court's interpretation of the insurance policies and the resulting grant of summary judgment *de novo*." *Netherlands Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013). The Board appeals the district court's grant of summary judgment on three grounds. First, it asserts that the property damage at issue in the underlying action was caused by a covered "occurrence," and that Nautilus had a duty to defend and indemnify the Developer in the state law action. Second, it argues that Nautilus should have been estopped from asserting a coverage defense because it took no action for almost two years after it first received notice of the state court action. Lastly, it argues that the completed products exclusion does not apply to the personal property damage alleged in the Board's second amended complaint, or that there exists a genuine question of material fact as to whether the exclusion

applies. It asserts that the initial discovery of the water damage, as attested to in an affidavit by one homeowner, occurred in May 2000. According to the Board, this date was before the Developer ceded control of the building pursuant to a written agreement in July 2000, and therefore before the date that the Developer completed its work.

We consider these arguments in turn.

## A

We first turn to the question of whether the property damage at issue in the state court action gave rise to a duty to defend by Nautilus. "To determine whether an insurer has a duty to defend its insured from a lawsuit, a court must compare the facts alleged in the underlying complaint to the relevant provisions of the insurance policy." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "If the facts alleged fall within, or potentially within, the policy's coverage, the insurer is obligated to defend its insured … even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy." *Id.* at 314–15 (citations omitted). However, if "it is clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage of the policy," the insurer may deny coverage. *Id.* at 315. Nautilus correctly argues that the Board's original and first amended complaints did not allege facts that would bring the case even potentially within the coverage of the policies. This is because those complaints alleged damage only to the building itself, and Illinois law is clear that damage to the building itself was not an "occurrence" within the meaning of the policies.

By their terms, the policies apply to "property damage" only if such damage is caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." While the policies do not define the term "accident," in interpreting insurance policies, "Illinois courts have defined 'accident' as an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Westfield Nat'l Ins. Co. v. Cont'l Cmty. Bank & Trust Co.*, 804 N.E.2d 601, 605 (Ill. App. Ct. 2003) (citation omitted). Moreover, "[t]he natural and ordinary consequences of an act do not constitute an accident." *Id.* Applying this principle in the context of development and building construction, several Illinois cases have held that "damages that are the natural and ordinary consequences of faulty workmanship do not constitute an 'occurrence' or 'accident.'" *Stoneridge Dev. Co. v. Essex Ins. Co.*, 888 N.E.2d 633, 652 (Ill. App. Ct. 2008) (collecting cases). To hold otherwise and "[f]ind[] coverage for the cost of replacing or repairing defective work," *Stoneridge* reasoned, "would transform the policy into something akin to a performance bond." *Id.* at 653 (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 503 (Ill. 2001) (internal quotation marks and citations omitted)). Another reason to disfavor such an interpretation is that "insurance proceeds could be used for damages from defective workmanship," or "a contractor could be initially paid by the customer for its work and then by the insurance company to repair or replace the work." *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1057 (7th Cir. 2012) (quoting *CMK Dev. Corp. v. W. Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1168 (Ill. App. Ct. 2009)) (internal quotation marks omitted). In order

to avoid such undesirable outcomes, Illinois courts require that for an incident to constitute an "occurrence" or "accident" in the building construction context, "there must be damage to something other than the structure, *i.e.*, the building, in order for coverage to exist." *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 16 (Ill. App. Ct. 2005) (citations omitted). "[T]he natural and ordinary consequences of defective workmanship … d[o] not constitute an 'occurrence.'" *Id.* [1]

Nautilus points out, and the Board does not seriously dispute, that the allegations in the original and first amended complaint in the underlying action involved only damage to the building itself, nothing more. Damage of this nature is clearly not an "occurrence" under Illinois law. The Board tries to circumvent this clear principle of law by inexactly describing the disposition below, referring to the "Underlying Complaints" collectively, and in so doing misrepresents the district court's holding. *See* Appellant's Br. at 7 ("The lower Court concluded that in conformity with the requirements of the Nautilus Policies, the Underlying Complaints include allegations that constitute 'property damage' caused by a covered 'occurrence' … ."). This brisk gloss obscures the fact that the first two complaints did not allege a covered "occurrence." It was not until the second amended complaint that personal property damage was alleged, and thus there was an alleged "occurrence" that could potentially come within the scope of Nautilus's policy language. The

---

[1] There is one Illinois case that suggests a contrary rule. *See Country Mut. Ins. Co. v. Carr*, 867 N.E.2d 1157, 1162 (Ill. Ct. App. 2007). However, *Carr* appears to be an outlier, and it was roundly criticized in *Stoneridge*, 888 N.E.2d at 651.

district court did not err in finding that the initial complaint and the first amended complaint in the state court action did not give rise to a duty to defend by Nautilus.

**B**

Before we move to the question of whether the second amended complaint gave rise to Nautilus's duty to indemnify, we quickly address the Board's assertion that Nautilus should be estopped from raising any policy defenses because it unreasonably dawdled in filing its declaratory judgment action. The Illinois Supreme Court has stated that

> Generally, where a complaint against an insured alleges facts within or potentially within the coverage of the insurance policy, and when the insurer takes the position that the policy does not cover the complaint, the insurer must: (1) defend the suit under a reservation of rights; or (2) seek a declaratory judgment that there is no coverage. If the insurer fails to take either of these actions, it will be estopped from later raising policy defenses to coverage.

*Standard Mut. Ins. Co. v. Lay*, 989 N.E.2d 591, 596 (Ill. 2013).

To avoid estoppel, the insurer must take one of these actions "within a reasonable time of a demand by the insured." *Korte Constr. Co. v. Am. States Ins.*, 750 N.E.2d 764, 770 (Ill. App. Ct. 2001).

In evaluating Nautilus's actions to determine if it did act within a reasonable amount of time, the Board urges us to calculate the time elapsed from the very first tender of the Board's original complaint in the underlying action to Nautilus's filing of the declaratory action. By this measure, twen-

ty-three months passed before Nautilus filed the declaratory action. The Board is correct that twenty-three months would likely be an unreasonable delay. *See, e.g.*, *W. Am. Ins. Co. v. J.R. Constr. Co.*, 777 N.E.2d 610, 620 (Ill. App. Ct. 2002) (finding a 21.5 month delay unreasonable).

However, the timeframe presented by the Board is not the proper one with which to evaluate whether Nautilus is estopped. "Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered." *See Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1135 (Ill. 1999). As discussed, there was no covered "occurrence" alleged until the Board filed its second amended complaint in the state court action. Because Nautilus had no colorable duty to defend against the original complaint or the first amended complaint, we must measure the time between when the Developer tendered the second amended complaint—the first one alleging personal property damage, as thus the first with facts that could give rise to a duty to defend—and when Nautilus filed the declaratory action. Measured that way, Nautilus acted within five months of being informed about the Board's second amended complaint, and sixteen months before the Developer settled with the Board. The Board does not argue that such a delay was unreasonable; if made, that argument would be contrary to what has been recognized in Illinois courts as a length of time insufficient to trigger estoppel. *See, e.g.*, *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 965 (Ill. App. Ct. 2001) (estoppel did not apply where insurer filed declaratory judgment action six months after receiving notice of the lawsuit and fifteen months before it was settled).

We thus decline to estop Nautilus from asserting its policy defenses.

## C

That brings us to the heart of the matter: whether the district court correctly concluded that the personal property damage alleged in the Board's second amended complaint fell within the policies' products-completed operations hazard exclusion, and thus failed to give rise to a duty to defend or indemnify by Nautilus. The exclusion removes from the scope of coverage any bodily injury or property damage that occurs "away from premises [the Developer] own[s] or rent[s] and arising out of" the Developer's product or work, but the policies continue to cover work that hasn't yet been completed or abandoned. Unsurprisingly, the Board argues that the water damage occurred before work on the building was completed, while Nautilus argues that once residents moved into the building, it was completed under the terms of the insurance policies. The key contractual provision on which their arguments turn is the following, defining when exactly work has been completed by the Developer for the purposes of the completed products exclusion:

"Your Work" will be deemed completed at the earliest of the following times:

> (1) When all of the work called for in your contract has been completed.
> (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
> (3) When that part of the work done at a job site has been put to its intended use by

> any person or organization other than another contractor or subcontractor working on the same project.

Read as a whole, this provision implies that the insured's work can be completed in different phases, with subsets of an insured's work falling out of the scope of coverage as they are completed. For example, under a reasonable reading of subclause (2), if a contract calls for work at three different sites, it is clear that an insured's completion of work at Site 1, while Sites 2 and 3 remain in progress, does not take all three sites out of the scope of coverage. That partial completion will serve to exclude only bodily injury or property damage that takes place at Site 1. Applying a similar interpretive gloss to subclause (3), it appears that completion can likewise take place in a piecemeal manner. The policies no longer cover each part of the work that has been put to its intended use by a non-contractor.

The second amended complaint in the state court action alleges that the Developer sold individual condominium units to homeowners represented by the Board, and that damage occurred to the personal property of these individual homeowners, who had moved the personal property into their units. The district court correctly surmised that the owners' moving of their personal property into the units indicates that the owners were putting the condominium units—at least the ones that had been completed and sold—to their intended use, thereby taking those units out of the scope of coverage under subclause (3). The Board argues that the units could not have been put to their intended use while the residents lacked access to the common areas. But it strains the English language to say that the intended use of

one area of the building must subsume the intended use of another area. Under any reasonable examination of the facts, the individual condominium units were intended to provide private living areas to their owners. There was no evidence in this case that the inability to access certain common areas interfered with the intended use of any of the individual units. We cannot see how the completed work exclusion does not apply to the damage incurred on those premises. At best, the Board's interpretation could provide a basis for the more specific argument that residents' personal property left in the common areas before they were completed, and subsequently damaged, would be within the scope of the policies' coverage—but that is not the Board's argument here.

The Board presents two additional arguments with regard to the completed products exclusion. First, it analogizes the present case to *U.S. Fid. & Guar. Co. v. Brennan*, 410 N.E.2d 613 (Ill. App. Ct. 1980), which construed a completed-operations exclusion similar to the one at issue here. The insured was a contractor hired to install HVAC units on the roofs of two school buildings, and the school district brought claims alleging that the contractor's faulty installation led to leaking and water damage inside the school buildings. The insurer brought a declaratory judgment action, but the trial court entered declaratory judgment in favor of the insured, finding that the exclusion did not clearly apply and thus the insurer had a duty to defend. The Illinois Court of Appeals affirmed, finding that the evidence did "not establish with certainty that the alleged water damage occurred after defendant left the job or even that it occurred after the district started using the installed equipment." *Id.* at 616. However, unlike in *Brennan*, the damage at issue in this matter certainly occurred *after* the residents began to use the condominium

units for their intended use. The Board concedes that the residents had moved their personal property in the condominium units. That unambiguously establishes that the intended use had begun by the time any destruction of personal property occurred because of the water leakage.

Second, the Board argues that the Developer's continued work on the common areas of the building indicates that the building was still a "premise[] [the Developer] own[ed] or rent[ed]" at the time of the initial water damage. But this reading—treating ownership or possession of one part of the building as equivalent to ownership or possession of the whole building—would essentially nullify subclause (3) by merging it with subclause (1), requiring that *all* of the work at the building be completed before the insured's work is considered complete. That interpretation would "offend[] a well-settled principle of contract construction: a contract must not be interpreted in a manner that nullifies provisions of that contract." *Atwood v. St. Paul Fire & Marine Ins. Co.*, 845 N.E.2d 68, 71 (Ill. App. Ct. 2006). We decline to adopt such an interpretation. Instead, we conclude that the residential units in question had been completed, and that any personal property damage sustained therein was excluded by the completed products exclusion.

### III

For the foregoing reasons, we AFFIRM the judgment of the district court.