SIXTH DIVISION
December 17, 2010

No. 1-09-1905

LIBERTY MUTUAL FIRE INSURANCE COMPANY,         )
         )
    Plaintiff and Counterdefendant/Appellee,         )
         ) Appeal from
         v.         ) the Circuit Court
         ) of Cook County
WOODFIELD MALL, L.L.C., Woodfield Associates, L.L.C., Taub-Co   )
Management, Inc., improperly sued as The Taubman Company, L.L.C., and ) 07 CH 08457
Taub-Co Management, Inc.,         )
         ) Honorable
    Defendants and Counterplaintiffs/Appellants         ) Sophia H. Hall,
         ) Judge Presiding.
(Nina Swanson, as Administrator of the Estate of Mark Swanson,   )
Deceased,         )
         )
    Defendant/Counterdefendant).         )

JUSTICE McBRIDE delivered the opinion of the court:

Nina Swanson, of McHenry, Illinois, filed a wrongful death and survival action against the

owners and managers of a large suburban shopping mall near Chicago, alleging their negligence in

2004 killed her husband Mark Swanson. Mark Swanson was a heating and air conditioning

equipment technician dispatched to the mall by his employer, Carrier Corporation, to service the

air conditioning equipment for one of the mall's tenants. Mark Swanson left the tenant's space,

went into "an interior corridor" of the mall where he accessed the equipment on the roof, and as

he was climbing back inside the building, he fell to the concrete floor 10-feet below, allegedly due

to an inordinate 28-inch gap between the roof hatch and the top rung of an affixed ladder. Nina

Swanson sued the mall, but not its tenant. The mall, however, tendered the complaint to the

tenant's commercial general liability insurer, which determined it had no duty to defend the mall and then prevailed on crossmotions for summary judgment in this declaratory judgment action. On appeal, the mall contends the trial court made multiple errors in its choice-of-law analysis, should have found the injuries arose from the tenant's "work" or "premises" which entitled the mall to additional insured coverage, should have recognized the lease contractually entitled the mall to primary insured coverage, and should have determined the insurer waived policy defenses.

The following undisputed facts are relevant to those arguments. The tenant's commercial general liability insurance policy for the one-year term beginning February 1, 2004, was issued by plaintiff insurer Liberty Mutual Fire Insurance Company, a Massachusetts corporation with a principal place of business in Massachusetts (Liberty Mutual). The named insureds include Luxottica U.S. Holdings Corporation, which is a Delaware corporation, a subsidiary of an Italian company, and the parent corporation of at least 33 United States corporations (Luxottica). Luxottica has a mailing address in Port Washington, New York. Luxottica's various subsidiaries were also listed on the written policy as named insureds and included the mall's tenant, LensCrafters, Inc., which was an Ohio corporation headquartered near Cincinnati in Mason, Ohio (LensCrafters). LensCrafters operates an extensive, nationwide chain of hundreds of retail eyeglass stores and in 1986 began leasing retail space from the mall defendants at Woodfield Mall in Schaumburg, Illinois. The insurance policy did not list the addresses of the individual LensCrafters stores; however, under the heading "Classifications and Locations," the coverage encompassed "All Operations of the Named Insured." None of the mall defendants was listed as a named insured in the policy declarations or appeared on the policy's "Named Insured

2

1-09-1905

Endorsement" page or any where else in the contract. The mall defendants, meaning the four defendants named in Swanson's negligence action, were Woodfield Mall, L.L.C., a foreign corporation which owns the mall in Schaumburg; Woodfield Associates, L.L.C., an Illinois corporation; The Taubman Company, L.L.C., a foreign corporation which manages the mall; and Taub-Co Management, Inc., another foreign corporation.

A "General Amendatory Endorsement" to the policy stated in relevant part:

"L. AMENDMENT -- BLANKET ADDITIONAL INSURED

SECTION II - WHO IS AN INSURED is amended to include as an insured any person, organization, state or other political subdivision, trustee or estate for whom you have agreed in writing to provide liability insurance. But:

The insurance provided by this amendment:

1. Applies only to 'personal injury' or 'property damage' arising out of (a) 'your work' or (b) premises or other property owned by or rented to you[.]"

The policy specified, "the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." Section 11.01 of LensCrafters' lease required it to name the owners and managers of Woodfield Mall as additional insureds on its comprehensive liability policy "with respect to the leased premises and the operations of Tenant and any subtenants of Tenant in, on or about the leased premises" and that "the coverage evidenced thereby shall be primary and non-contributing with respect to any policies carried by [the owners and managers of the mall], and that any coverage carried by [the owners and managers] shall be excess insurance." Thus, when the lease

3

and policy are read together, the mall defendants are additional insureds on LensCrafters' policy, but only for personal injury or property damage arising out of LensCrafters' premises and operations at Woodfield Mall.

The preamble and section 1.01 of the lease defined the "Leased Premises" as "Store Number 330, situated on the upper level of Building 'D', having an irregular shape and consisting of approximately 5,561 square feet." A letter agreement that was simultaneously executed with the lease described the "'leased premises' " as "space *** *in* the Shopping Center to be known as Woodfield Mall." (Emphasis added.) The lease was modified in 1996 to extend the rental period for an additional 10 years through November 30, 2006, and the renewal stated the original lease was "for a retail business to be operated under the trade name 'LENSCRAFTERS,' covering premises identified as Store No. 'D-330', *in* the regional retail development commonly known as WOODFIELD MALL." (Emphasis added.) Also relevant is section 1.01 of the original lease, which specified:

> "(b) The exterior walls and the roof of the leased premises and the area beneath said premises are not demised hereunder, and the use thereof, together with the right to locate, both vertically and horizontally, install, maintain, use, repair and replace pipes, utility lines, ducts, conduits, flues, refrigerant lines, drains, sprinkler mains and valves, access panels, wires and structural elements leading through the leased premises serving other parts of the Shopping Center, is hereby reserved unto Landlord. Landlord reserves an easement above Tenant's finished ceiling to the roof, or to the bottom of the floor deck above the leased

4

premises, for general access purposes and in connection with the exercise of

Landlord's other rights under this Lease."

The preamble and section 7.01 of the lease limited the tenant's "Permitted Use" and "Use of Premises" to "The retail sale of eyeglasses, contact lenses, solutions and all optical accessories related to the retail optical business; in addition, the on-premises professional optometric eye examination business and the on-premises manufacturing of prescription eyeglass lenses and contact lenses."

The lease also addressed the operation and maintenance of the shopping center's common areas. Section 8.02 defined the " 'common areas' " to include "stairs ***not contained within any leased premises" and "service and fire and exit corridors." In section 8.01, the landlord "agree[d] to cause to be operated and maintained *** all common areas within the Shopping Center" and specified that the "manner in which such areas and facilities shall be operated and maintained *** shall be at the sole discretion of Landlord." In section 10.01, the landlord agreed to "keep and maintain the roof (including the structural integrity thereof), foundation and exterior surfaces of the exterior walls of the building in which the leased premises are located *** in good order, condition and repair."

In section 10.02, LensCrafters agreed to "keep and maintain in first class appearance *** and in good order, condition and repair as determined by Landlord *** the leased premises and every part thereof and any and all appurtenances thereto wherever located but exclusively serving the leased premises, including, but without limitation, *** ventilation, heating and air conditioning and electrical systems (whether or not located in the leased premises but exclusively serving the

leased premises), sprinkler systems, walls, floors and ceilings." Beginning in 2004, LensCrafters entered into a three-year HVAC preventive maintenance and repair service contract with Carrier Corporation which encompassed LensCrafters numerous retail outlets. In accordance with this contract, the LensCrafters store in Woodfield Mall contacted Carrier Corporation when the air conditioning in its lab stopped working and Carrier Corporation sent its employee Mark Swanson to investigate and fix the problem.

Also relevant is that in section 11.03 of the lease, LensCrafters agreed to indemnify the mall defendants and "save them harmless (except for loss or damage resulting solely from the negligence of Landlord or breach of this Lease by Landlord) from and against any and all claims."

After Liberty Mutual was notified of Mark Swanson's accident and untimely death, it sent a letter to the mall defendants in 2005 stating "we cannot determine at this time whether there is a potential of coverage [for the mall defendants] under the policy" and "will be continuing our investigation into this claim under a reservation of rights." The letter summarized what occurred at the shopping center and set out the portions of the General Amendatory Endorsement (quoted above) which indicated when additional insured status would occur and that the scope of coverage was expressly limited to " 'personal injury' or 'property damage' arising out of (a) "[the named insured's] work or (b) premises or other property owned by or rented to [the named insured]." The insurance company's letter continued:

> "The lease between the Mall and LensCrafters requires LensCrafters to
> provide additional insured status to the Mall. As a result, the Mall is an insured
> but only with respect to liability arising out of the premises leased to LensCrafters.

> We cannot determine from the information we currently have whether the Mall's liability arose from the premises leased to LensCrafters. We will be conducting further investigation into that issue."

The letter concluded with reservation-of-rights language: "While we have attempted to address all of the coverage issues related to this claim, Liberty Mutual reserves all rights under applicable law and the policy. This letter should not be construed as a waiver or estoppel of any possible coverage defenses afforded by the policy or applicable law." A nearly identical letter sent on November 13, 2006, will be set out below in conjunction with one of the mall's arguments for reversal. In that letter, Liberty Mutual agreed to provide a defense. However, on March 26, 2007, it filed this action seeking a declaration of no duty to defend or indemnify and alleging in part that Ohio law would govern any dispute about the parties' rights and obligations. The mall defendants counterclaimed.

Discovery in this coverage action included deposing Sebastian DiBella, an account executive employed by the insurance brokerage and consulting firm BWD Group, L.L.C. (BWD), located in Jericho, New York. DiBella indicated BWD had been handling Luxottica's insurance coverage for about 15 years and that he helped the company evaluate its needs and negotiate the coverage terms and cost of the insurance policy at issue. DiBella's primary contacts at Luxottica were Jim Bettner, who was their director of risk management, and Bettner's boss, Greg Muntel. DiBella made recommendations to Muntel and Bettner and those gentlemen made the decisions. DiBella acknowledged that Luxottica's address in Port Washington, New York, appeared on the declarations page of the insurance policy, but explained that Liberty Mutual sent the proposed

policy directly to BWD, BWD reviewed it, and then DiBella personally delivered it to Muntel and Bettner during a meeting at the Luxottica office in Mason, Ohio. After the meeting, DiBella negotiated additional terms with Liberty Mutual's employees Terry Schell, who was an account executive in Cincinnati, Ohio, and/or Joanne Venuti, who was a national accounts underwriter in Boston, and then Liberty Mutual bound the coverage.

DiBella's deposition transcript was one of the documents considered by the trial court in the summary judgment proceedings. As we stated above, Liberty Mutual prevailed on the cross-motions for summary judgment and this appeal by the mall followed.

Summary judgment is properly granted where the pleadings, deposition transcripts, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c)) (West 2006). Summary judgment is a drastic means of disposing of litigation, but is an appropriate measure in cases meeting these criteria. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390-91, 620 N.E.2d 1073, 1077 (1993). Appeals from the entry of summary judgment are addressed *de novo* by this court. *Crum & Forster*, 156 Ill. 2d at 390, 620 N.E.2d at 1077.

The mall's first specific argument is that the trial court erred in determining Ohio rather than Illinois or New York had the "most significant contacts" with the insurance policy and would control the interpretation of the parties' rights and obligations under the contract. Often insurance policies contain express choice-of-law provisions, but when a policy is silent, its provisions are governed by the substantive law of (1) the location of the subject matter, (2) the

8

domicile of the insured or of the insurer, (3) the place of the last act to give rise to an enforceable contract, (4) the place of performance, or (5) any other place bearing a rational relationship to the contract. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 526-27, 655 N.E.2d 842, 845 (1995). These factors do not have equal significance and are to be weighed according to the issue involved. *Emerson Electric Co. v. Aetna Casualty & Surety Co.*, 319 Ill. App. 3d 218, 232, 743 N.E.2d 628, 640 (2001). At least some of the factors in a choice-of-law analysis "will point in different directions in all but the simplest case." Restatement (Second) of Conflict of Laws §6, Comment *c*, at 12 (1971). "Hence, any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." Restatement (Second) of Conflict of Laws §6, Comment *c*, at 12 (1971). A choice-of-law analysis should consider the contracting parties' justified expectations, yield certain, predictable, and uniform results, and avoid inconsistent interpretations of the same insurance contract. *Emerson Electric*, 319 Ill. App. 3d at 232, 743 N.E.2d at 640.

The mall argues the location of the contract's subject matter is the insured risk in Illinois and this fact should be given extra emphasis. The mall relies on *Diamond State Insurance Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471, 488-89, 611 N.E.2d 1083, 1095 (1993), and *Society of Mount Carmel v. National Ben Franklin Insurance Co. of Illinois*, 268 Ill. App. 3d 655, 664, 643 N.E.2d 1280, 1287 (1994), in which the courts construed the state where liability arose to be the location of the insured risk and worthy of greater weight than any other single contact under consideration. The courts noted parenthetically that under this approach, a policy which insured risks located in "several" or "different" states would be treated as separate policies each insuring a

9

separate risk. *Diamond State*, 243 Ill. App. 3d at 489, 611 N.E.2d at 1095; *Society of Mount Carmel*, 268 Ill. App. 3d at 665, 643 N.E.2d at 1287. We consider these cases distinguishable, in that the risks insured there appear to be limited to a few tangible products or to a few specific locations that were itemized in the policy, while the insured risk in this case is the operations and premises of a national chain store with retail locations too numerous to be listed in the insurance policy. Moreover, the courts' parenthetical remarks in *Diamond State* and *Society of Mount Carmel* were based on a passage from the Restatement (Second) of Conflict of Laws, which indicates:

> "A special problem is presented by multiple risk policies which insure against risks located *in several states*. A single policy may, for example, insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the *several states* involved. *Presumably*, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk." (Emphasis added.) Restatement (Second) of Conflict of Laws §193, Comment *f*, at 613-14 (1971).

*Diamond State*, 243 Ill. App. 3d at 488-89, 611 N.E.2d at 1095 (discussing Restatement (Second) of Conflict of Laws, section 193); *Society of Mount Carmel*, 268 Ill. App. 3d at 665, 643 N.E.2d at 1287 (same). We do not consider the commentators' reasoning or admitted mere presumption about a policy insuring as few as three single-family homes to be relevant to the

10

current commercial general liability policy insuring all the locations of a major, nationwide retail chain. Accordingly, we decline to follow *Diamond State*, 243 Ill. App. 3d at 488-89, 611 N.E.2d at 1095, or *Society of Mount Carmel*, 268 Ill. App. 3d at 665, 643 N.E.2d at 1287, and give undue weight to the location of the insured risk in Illinois.

Instead, the more pertinent analysis appears in *Lapham-Hickey Steel*, a subsequent supreme court case concerning a policy broadly covering "all risks of physical loss or damage" at a steel company's facilities in six different states. *Lapham-Hickey Steel*, 166 Ill. 2d at 523, 655 N.E.2d at 843. Although its Minnesota facility was listed in the policy and was the site of the environmental contamination at issue, the court determined the location of the insured risk in the midwestern state was entitled to little weight because the broad policy covered risks in multiple states and the contract expressed a choice of law in only two, limited instances. *Lapham-Hickey Steel*, 166 Ill. 2d at 527, 655 N.E.2d at 845. On the other side of the scale were the facts that the policy was delivered in Illinois by an Illinois brokerage to an Illinois corporation licensed to do business in Illinois. *Lapham-Hickey Steel*, 166 Ill. 2d at 527, 655 N.E.2d at 845. The court concluded that reasonable application of the choice-of-law factors and obtaining a "consistent interpretation of the policy" dictated that Illinois law would govern. *Lapham-Hickey Steel*, 166 Ill. 2d at 527, 655 N.E.2d at 845.

After the supreme court decided *Lapham-Hickey Steel*, Illinois courts have deemphasized the location of the insured loss when the policy's risks are spread nationwide. *Lapham-Hickey Steel*, 166 Ill. 2d 520, 655 N.E.2d 842. For instance, in *Emerson Electric*, the parties disagreed over whether Missouri or other states' laws would control a coverage dispute about liability for

11

environmental damage in 22 different states, where the insured was based in Ferguson, Missouri, a suburb of Saint Louis, and had 40 divisions and subsidiaries doing business around the country. *Emerson Electric Co.*, 319 Ill. App. 3d at 223, 743 N.E.2d at 634. None of the pollution occurred in the insured's home state of Missouri. *Emerson Electric*, 319 Ill. App. 3d 218, 743 N.E.2d 629. The court reasoned: "Though the location of the insured risk is often seen as the most important factor in this sort of analysis, that is not the case where, as here, the risk locations are scattered through several states." *Emerson Electric*, 319 Ill. App. 3d at 232, 743 N.E.2d at 640. Instead, the court looked for the location which appeared to be most likely contemplated by the parties as the source of law and would also serve the interests of predicatability, uniformity of result, and ease in determining and applying the law. *Emerson Electric*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642. The court gave special emphasis to the Missouri corporation's principle place of business because it had an "active, dominan, and dynamic role in the procurement of all of these policies." *Emerson Electric*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642.

> "According to the record, the procurement of insurance for both Emerson and its subsidiaries was largely coordinated out of Emerson's corporate headquarters in St. Louis. Michael Zimmer worked at Emerson's headquarters from 1964 to 1986, starting as corporate insurance manager in Emerson's treasury department, and later becoming head of Emerson's newly formed insurance risk management department. *** His responsibilities included negotiating for the placement of insurance coverage, which required the gathering of information relating to Emerson's various businesses which were to be covered. That information was

provided by Emerson's various subsidiaries and divisions. Zimmer was the 'point person' for gathering this data, which was then reviewed with Emerson's [Chicago] insurance broker. As companies were acquired by Emerson, Zimmer generally took on responsibility for their insurance, recommending 'a program that would have typically involved their [the companies'] participation in Emerson's corporate insurance risk program.' ***

Since Emerson's corporate treasury department and later its risk management department, both located at Emerson's headquarters in St. Louis, figured so prominently in the procurement of insurance not only for Emerson but also for its subsidiaries, the location of Emerson's headquarters in Missouri clearly merits significant weight in this analysis." *Emerson Electric*, 319 Ill. App. 3d at 235-36, 743 N.E.2d at 642.

The court also considered that the policy was personally delivered in Missouri, the insurance contracts were kept in a safe in Missouri (the domicile of the insured), the policy payments took place in Missouri (the last act to give rise to the contract), and the claims would be paid in Missouri (the place of performance). *Emerson Electric*, 319 Ill. App. 3d at 233-35, 743 N.E.2d at 639-641. Missouri was the location that tied the contracting parties together and was most likely contemplated by them at the time of contracting to be controlling. *Emerson Electric*, 319 Ill. App. 3d at 234-35, 743 N.E.2d at 641-42. We acknowledge that *Emerson Electric* involved environmental damage sites in multiple states, in contrast to Swanson's action concerning one accident in Illinois. *Emerson Electric*, 319 Ill. App. 3d 218, 743 N.E.2d 629. Nevertheless, the

*Emerson Electric* and LensCrafters policies are similarly broad general liability contracts which cover numerous locations, and the contracting parties could justifiably anticipate at the time of contracting that the site of a specific loss would be given little weight.

*Lapham-Hickey Steel*, not *Diamond State* or *Society of Mount Carmel*, was followed in *Westchester*, a case involving two broad commercial umbrella policies, one insuring a national brewing company and 50 other companies and the other insuring the national brewing company and over 100 other companies. *Westchester Fire Insurance Co. v. G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 625, 747 N.E.2d 955, 958 (2001). After pointing out that the policies provided general liability insurance for the brewing company everywhere it did business and "were apparently designed to provide coverage without regard to location of risks," the *Westchester* court criticized the trial judge for relying on the "principal location of [the insured] risk" analysis employed in *Society of Mount Carmel*. *Westchester*, 321 Ill. App. 3d at 632, 747 N.E.2d at 964; *Society of Mount Carmel*, 268 Ill. App. 3d 655, 643 N.E.2d 1280. The state where the insured loss was located was not pertinent when the policies "covered risks nationwide and did not specifically state the location of the risk." *Westchester*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962. Instead, like *Emerson Electric*, the court focused on the insured's principal place of business or " 'nerve center' " (*Westchester*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962, quoting *Krueger v. Cartwright*, 996 F.2d 928, 931 (7th Cir. 1993)), which it defined as "the location of business decision making" and the "location of the offices responsible for the main activities of the entity." *Westchester*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962, citing *Illinois Life & Health Insurance Guaranty Ass'n v. Boozell*, 289 Ill. App. 3d 621, 682 N.E.2d 291

(1997). The court also took into consideration the domicile of the insured, where the policy was delivered to the brewing company (the last act giving rise to the contract), where the insurer's representative handling problems and complaints was located, and where the insurance broker was located. *Westchester*, 321 Ill. App. 3d at 629, 747 N.E.2d at 962.

Like these latter cases, the policy currently at issue covered risks which could arise any where in the country and did not specifically state the location of the insured risks. Because LensCrafters' locations all over North America were covered, the "location of the risk" analysis employed in *Diamond State* and *Society of Mount Carmel* would not be appropriate. *Diamond State*, 243 Ill. App. 3d 471, 611 N.E.2d 1083; *Society of Mount Carmel*, 268 N.E.2d 655, 643 N.E.2d 1280. On the basis of this authority, we have also determined that the place where the underlying action was filed "cannot be equated with the location of the [national] subject matter or insured risk" and is entitled to "little or no significance to our analysis." *Westchester*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962. LensCrafters is the entity we have focused on because the coverage claim is based on the mall's written lease with LensCrafters; the mall has no relationship with the other named insureds which include the parent company Luxottica and sister corporations in various parts of the United States. LensCrafters is a named insured and the availability of coverage is not dependent upon its corporate affiliations. The record substantiates that LensCrafters is domiciled in Mason, Ohio, and its insurance procurement occurred entirely in that state. Muntel was the " 'point person' " (*Emerson Electric*, 319 Ill. App. 3d at 235, 743 N.E.2d at 642) who coordinated all the insurance needs of Luxottica's numerous subsidiaries out of his Ohio office. In addition, insurance broker DiBella traveled from his office in New York to

hand deliver the policy to Muntel in Ohio. *Emerson Electric*, 319 Ill. App. 3d at 233, 743 N.E.2d at 641 (considering location of policy delivery). The Ohio facility was also the headquarters and "nerve center" for all of the LensCrafters stores. *Westchester*, 321 Ill. App. 3d at 630, 747 N.E.2d at 962 (considering location of decision making). The record does not disclose how the insurance premiums were paid, but presumably they emanated from the Ohio headquarters, and even if they did not, the mall has never contended it needed additional discovery time to unearth this detail. *Emerson Electric*, 319 Ill. App. 3d at 233, 743 N.E.2d at 641 (considering location of premium payments). Ohio has more significant contacts with this insurance contract than New York or Illinois.

The mall argues in the alternative that if we do not give extra emphasis to the purported principal location of risk in Illinois, we should focus on the declarations page of the policy indicating the contract was mailed to Luxottica's address in New York. The mall argues this shows the policy was delivered to the insured in New York and, therefore, that state's laws control interpretation of the policy provisions, rather than Ohio's. The record, however, does not show that the policy was delivered to the insured in New York. Insurance broker DiBella stated without contradiction that he did not know why Luxottica's New York address appeared on the policy declarations page and that he had personally delivered the contract to Muntel in Ohio. Thus, the record shows Ohio, not New York, was the place of delivery to the insured.

Contradicting its contention that the policy was mailed to Luxottica in New York, the mall next cites DiBella's deposition transcript for the proposition that the policy was sent to DiBella in New York. The mall characterizes this as the "last act that gave rise to the valid insurance

16

contract." (If this truly was the last act in the contracting process, the subsequent delivery to the insured would be inconsequential and should not have been argued above.) The mall also contends the payment of premiums occurred in New York. It concludes these circumstances "creat[ed] another significant contact in favor of applying New York law." We do not reach the same conclusion. Although some courts have considered the location of an intermediary insurance broker, the mall has failed to discuss any precedent to that effect and DiBella testified that his role in the procurement process was to make recommendations only to his clients in Ohio, Muntel and Bettner, who made the contracting decisions. Therefore, we fail to see the relevance of the location of this particular broker in this choice-of-law analysis. And, again, the record does not definitely indicate where premiums were paid, but the location of the insured's headquarters in Ohio and Muntel and Bettner's presence there suggests the payments emanated in Ohio.

Another unpersuasive argument is premised on the facts that LensCrafters is domiciled in Ohio, Luxottica is domiciled in New York, Liberty Mutual is domiciled in Massachusetts, and Liberty Mutual is licensed to do insurance business in "numerous other states." The mall argues that given all the options, we should defer to the New York domicile of the parent corporation, Luxottica. As we explained above, details about the parent corporation are red herrings, and our consideration of the contracting process led us to conclude Ohio was the linchpin state. Furthermore, Liberty Mutual's domicile in Massachusetts would be pertinent if this insurance company played an active role in the contracting process, but it did not; and the fact that the *insurer* is licensed to do business/enter into contracts in various jurisdictions has no apparent relevance to any choice-of-law analysis. See *Lapham-Hickey Steel*, 166 Ill. 2d at 526-27, 655

17

1-09-1905

N.E.2d at 845 (choice-of-law analysis is based on facts having a rational relationship to the insurance contract).

The mall's final argument regarding the choice-of-law issue is that since Swanson's claim, if successful, would be paid in Illinois, then contract performance would occur in Illinois. In our opinion, even if insurance proceeds were paid in Illinois, this one factor would not outweigh the combination of the other factors discussed above.

For all these reasons, we conclude that Ohio has the most significant contacts with the contract and the substantive law of that jurisdiction controls the interpretation of the policy provisions.

The mall's second main argument on appeal is based on the policy language limiting its additional insured coverage to injuries that are "arising out of (a) 'your work' or (b) premises or other property owned by or rented to you," where the policy defines "your" and "you" to mean the named insured LensCrafters. Although the mall is asking us to interpret a policy provision, it fails to cite Ohio authority and has therefore waived our consideration of this contention. *Village of Riverwoods v. BG Ltd. Partnership*, 276 Ill. App. 3d 720, 729, 658 N.E.2d 1261, 1268 (1995) (finding waiver where appellant failed to cite supporting authority). In any event, the mall's argument fails under the facts, Ohio authority, and the Illinois authority it relies upon.

When construing an insurance contract, an Illinois court will give the parties' words their plain, ordinary, and generally accepted meaning. *Continental Casualty Co. v. Donald T. Bertucci, Ltd.*, 399 Ill. App. 3d 775, 776, 926 N.E.2d 833, 836 (2010).

*Davis* indicates that under Ohio law, additional insured coverage extends only to vicarious

18

liability for negligence of the named insured (*Davis v. LTV Steel Co.*, 128 Ohio App. 3d 73, 716 N.E.2d 766 (1998)), and thus, Liberty Mutual has no duty to defend the mall from Swanson's action alleging the mall's own negligent act or omission caused Mark Swanson's injuries. In *Davis*, LTV, a steel company, hired an industrial cleaning company, Shafer, to clean tar sumps at an LTV facility in Warren, Ohio. *Davis*, 128 Ohio App. 3d at 734, 716 N.E.2d at 767. Their contract required Shafer to purchase comprehensive general liability insurance and to name LTV as an additional insured. *Davis*, 128 Ohio App. 3d at 735, 716 N.E.2d at 768. An endorsement to the policy provided additional insured " 'only with respect to liability arising out of your operations or premises owned by or rented to you' " (emphasis omitted) where " 'your' " and " 'you' " referred to the named insured. *Davis*, 128 Ohio App. 3d at 736, 716 N.E.2d at 769. Two of Shafer's employees were injured on the job when they fell into an open sump, allegedly because a protective grating had been removed, and they sued LTV for negligence in maintaining its property. *Davis*, 128 Ohio App. 3d at 735, 716 N.E.2d at 768. LTV sought coverage under the additional insured language, but lost a declaratory judgment action and an appeal. *Davis*, 128 Ohio App. 3d 733, 716 N.E.2d 766. LTV, like the mall defendants here, sought an expansive interpretation of the phrase " 'arising out of' " in the additional insured endorsement. *Davis*, 128 Ohio App. 3d at 736, 716 N.E.2d at 769. The appellate decision indicates:

> "LTV argues that the language of the additional-insured endorsement should be construed broadly so that LTV was protected from all liability arising out of or connected to the operations of Shafer, regardless of whether the liability was attributable to the negligence of LTV, Shafer, a third party, or some

19

combination thereof.  We disagree with this interpretation of the additional-insured endorsement.

The plain language of the endorsement extended coverage to LTV only with respect to liability arising out of Shafer's operations or premises owned by or rented to Shafer.  The phrase 'arising out of your operations' in the endorsement was intended to protect LTV from any liability for the negligence of Shafer's employees who would be performing the industrial cleaning at the LTV plant.  See *e.g.*, [*Buckeye Union Insurance Co. v. Zavarella Brothers Construction Co.*, 121 Ohio App. 3d 147, 151-52, 699 N.E.2d 127, 130-31 (1997).]  In other words, the purpose of the additional-insured endorsement was to protect the additional insured ( *i.e.,* LTV) from being vicariously liable for the tortious acts of the named insured ( *i.e.,* Shafer)." *Davis*, 128 Ohio App. 3d at 736-37, 716 N.E.2d at 769.

*Davis* was based in part on *Buckeye Union Insurance*, another Ohio case involving a contractual obligation to obtain additional insured coverage.  *Buckeye Union Insurance*, 121 Ohio App. 3d at 148, 699 N.E.2d at 128.  When an employee of the named insured was injured on the jobsite and sued the additional insured, the additional insured sought a defense under the policy and later indemnification for the expenses it incurred defending the suit.  *Buckeye Union Insurance*, 121 Ohio App. 3d 147, 699 N.E.2d 127.  An endorsement to the policy's additional insured clause is similar to the one at issue here and read:

" 'WHO IS [AN] INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule *** *but only with respect to liability*

20

*arising out of "your work" for that insured or by you.'* (Emphasis added.) In the context of this endorsement, the word 'you' refers to [the named insured].

We find, as a matter of law, that the additional-insured clause of the policy could only cover [the additional insured] for liability arising from [the named insured's] work for [the additional insured]. If we were to read the additional-insured clause as permitting [the additional insured] to be insured against its own negligence, it would run counter to the public policy [of Ohio]. ***

We have no doubt that the additional-insured language of the policy permits no recovery [here]. The employee filed causes of action against [the additional insured] seeking damages for [the additional insured's] negligence. Certainly, the employee's causes of action *** did not relate to any negligence [by the named insured]." *Buckeye Union Insurance*, 121 Ohio App. at 151, 699 N.E.2d at 130.

This reasoning makes clear that the purpose of additional insured coverage is to protect the additional insured from claims of vicarious liability, that is, liability based entirely on the relationship between the two insureds, as opposed to any active negligence on the part of the additional insured. Ohio law does not support the mall's argument for reversal.

The mall's argument also fails under Illinois law. Citing *Maryland Casualty*, the mall contends the policy language " 'arising out of' " requires a "but for" causation test and "but for" the LensCrafters' lease and its service call for HVAC maintenance, Mark Swanson would not have been at Woodfield Mall on the day he was fatally injured. *Maryland Casualty Co. v.*

21

1-09-1905

*Chicago & North Western Transportation Co.*, 126 Ill. App. 3d 150, 154, 466 N.E.2d 1091, 1094 (1984), quoting *Western Casualty & Surety Co. v. Branon*, 463 F. Supp. 1208, 1210 (E.D. Ill. 1979) (" 'Arising out of'has been held to mean 'originating from,' 'having its origin in,' growing out of,' and flowing from' ").

The mall argues Mark Swanson's injuries arose out of LensCrafters' "work," where the policy defines "your work" as "Work or operations performed by you or *on your behalf.*" (Emphasis added). The argument is a distortion of *Maryland Casualty*'s "but for" analysis. *Maryland Casualty*, 126 Ill. App. 3d at 155, 466 N.E.2d at 1094. According to Swanson's complaint, Mark Swanson's injuries occurred when he was performing HVAC maintenance and repair on behalf of his employer, Carrier Corporation. The record tendered on appeal includes (a) the contract obligating Carrier Corporation to "provide Heating/Ventilation/Air Conditioning Preventative Maintenance and Repair Services" to LensCrafters, (b) business records indicating Carrier Corporation inspected the store's HVAC equipment and recommended replacement rather than repair, and (c) the shopping center lease describing LensCrafters' activities as "[t]he retail sale of eyeglasses, contact lenses, solutions and all optical accessories related to the retail optical business; in addition, the on-premises professional optometic eye examination business and the on-premise manufacturing of prescription eyeglass lenses and contact lenses." The mall's alleged liability does not stem from the sale of eyewear or contact lenses, eye examinations, or lens manufacturing, by or on behalf of LensCrafters. Mark Swanson was performing Carrier Corporation's HVAC "work" rather than LensCrafters' eyewear-related "work" when his unfortunate accident occurred

22

Returning to the policy language, the mall also argues Mark Swanson's injuries arose out of LensCrafters' retail "premises," but the mall misconstrues *Maryland Casualty* as a premises liability case when, in reality, liability was imposed there because the named insured employed the injured party, and here, the named insured LensCrafters did not employ the injured party. *Maryland Casualty Co.*, 126 Ill. App. 3d at 155, 466 N.E.2d at 1094; see also *Electric Insurance Co. v. National Union Fire Insurance Co of Pittsburgh.*, 346 F. Supp. 2d 958, 966 (N.D. Ill 2004) ("In fact, every Illinois court that has found 'but for' causation in the additional insured context has done so because the injured party was, like the injured party in *Maryland Casualty*, the named insured's employee"). Furthermore, Mark Swanson's accident did not arise out of covered "premises." According to section 11.01 of the lease which the mall drafted, the insurance policy procured by the tenant had to cover "the leased premises and operations of Tenant and any subtenants of Tenant in, on, or about the leased premises." The preamble and section 1.01 of the lease define the "Leased Premises" as "Store Number 330, situated on the upper level of Building 'D." The letter agreement that was simultaneously executed with the lease stated the " 'leased premises' " was "space *** *in* (emphasis added) the Shopping Mall to be known a WOODFIELD MALL" and the lease extension drafted by the mall and executed in 1996 reiterated that the demised premises were "for a retail business to be operated under the trade name 'LENSCRAFTERS,' covering premises identified as Store No. 'D-330,' *in* the regional retail development commonly known as WOODFIELD MALL." (Emphasis added.) It is undisputed that Mark Swanson's investigation started in the retail space leased to LensCrafters, but Swanson specified that Mark Swanson was in "an interior corridor to the roof of the mall," which was a

common area of the shopping center not demised to LensCrafters, and no longer "in, on, or about the leased premises," attempting to repair the air conditioning equipment that cooled the store's eyewear lab when he slipped from an affixed ladder which was controlled and maintained by the mall. The mall's own lease indicates it was not contractually entitled to coverage under the LensCrafters' policy for the accident that occurred while Mark Swanson was away from the leased premises conducting HVAC maintenance and repairs.

Because Mark Swanson's injuries did not arise out of LensCrafters' work as an eyewear retailer or arise out of LensCrafters' leased premises on the third floor of the mall, the policy did not encompass the unfortunate turn of events. Thus, even under the Illinois law the mall contends is controlling, we do not find the policy language requires Liberty Mutual to defend the mall from Swanson's allegations.

The mall's third main argument is that the trial court took an overly narrow view of Swanson's allegations that the mall's negligence caused Mark Swanson's injuries and death and should have determined Swanson might, possibly, amend her pleading in the future to claim LensCrafters was primarily liable due to its own negligent acts or omissions and that the mall was secondarily liable. The mall contends this scenario was not "pled directly or artfully" but, nonetheless, it might be pled and, under Ohio law, allegations of this nature would trigger the insurer's duty to defend LensCrafters as a primary, named insured and then the mall as an additional insured. We find this argument has been waived due to the mall's failure to cite and analyze any supporting facts in the record. *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 38, 785 N.E.2d 108, 121 (2003) (appellant cannot omit factual foundation and expect an appellate court

24

to sift through the record to find support for a determination favorable to appellant's position). This section of the mall's brief lacks any record citation whatsoever. Furthermore, it is undisputed that the mall defendants are the only parties named in Swanson's pleading and all the allegations concern the mall's own, independent tortious conduct regarding a common area of the shopping center solely within the mall's control. More specifically, Swanson's common allegations state in relevant part:

"3. On 8-24-04, a fixed ladder/stairwell existed at Woodfield Mall near the LensCrafters Store that led from an interior corridor to the roof of the mall.

4. Defendant [mall] did at all times own and control the ladder/stairway.

5. The ladder/stairway provided access to the roof for contractors and other authorized users.

6. Access from the ladder/stairway to the roof was through a hatch located on the roof.

7. The ladder/stairway contained handrails on both sides and flat steps with a top step approximately 28 inches below the top of the roof hatch.

8. Access to the ladder/stairway could only be accomplished by stepping over the side of the raised roof hatch and 28 inches down to the first rung/step.

9. Mark Swanson was at all times employed by Carrier Corporation as a heating and air conditioning technician.

10. Defendant [mall] or its agents did at all times contract with Carrier Corporation to provide repair and maintenance services for the heating and air

25

conditioning equipment at the mall.

11. On 8-24-04, Mark Swanson was dispatched to Woodfield Mall by Carrier Corporation to provide heating/air conditioning services.

12. At the above time and place, Mark Swanson was attempting to descend the subject ladder/stairway from the roof when he fell to the concrete floor of the corridor.

13. Defendant [mall] had a duty at all times material herein to provide a ladder/stairway that was safe and which provided safe access to and from the roof.

14. Defendant [mall] was negligent b[efore] and at the time of the occurrence in one or more of the following respects.

    a. Failed to provide a ladder/stairway in which the vertical spacing of the rungs/steps was uniformly 12 inches between the rung/step centers throughout the length of the climb.

    b. Provided and maintained a ladder/stairway in which the top rung/step was approximately 28 inches below the top of the roof hatch.

    c. Failed to provide a ladder/stairway that could be safely mounted and descended from the roof.

    d. Failed to provide a ladder/stairway that clearly communicated how it should be used by people going to and from the roof.

    e. Installed a raised roof hatch at the top of the ladder/stairway that required a user to step over the side of the hatch and 28 inches down to the

first rung/step of the ladder/stairway.

> f.  Failed to provide a safe means of descent from the roof.
>
> g.  Failed to install a new ladder/stairway or roof hatch.
>
> h.  Failed to repair/modify the ladder/stairway or roof hatch.
>
> i. Failed to warn of the hazards associated with the use of the

ladder/stairway.

15.  As a direct and proximate result of the foregoing wrongful acts, Mark

Swanson fell from the ladder/stairway on 8-24-04 and died on 9-3-04."

None of the allegations suggest in any way that the mall could be held vicariously liable for tortious acts or omissions of its tenant LensCrafters.  None of the allegations create doubt or uncertainty as to whether a theory of recovery within the policy's coverage has been pled. Furthermore, the mall states the trial court had authority to consider  "matters outside the pleadings," but it does not explain what "matters outside the pleadings" could have and should have been considered.  It appears the mall's entire argument regarding the potential for secondary liability is speculation.  Accordingly, if this argument had not been waived by failure to provide record citation and adequate analysis, we would have rejected it on the merits.

Next, the mall recasts its secondary liability argument under Illinois law.  We remain unpersuaded because none of the allegations suggest the potential for liability on the part of LensCrafters.

This brings us to the mall's fourth main argument, which is that its lease with LensCrafters entitles it to be a primary insured on LensCrafters' policy.  This argument is based on section

11.01 of the lease which requires LensCrafters to procure and keep in effect a minimum amount of comprehensive general liability insurance policy. The mall omits the additional language in section 11.01 indicating this insurance coverage shall be "with respect to the leased premises and the operations of Tenant and any subtenants of Tenants in, on or about the leased premises." It chooses to quote a clause indicating "the coverage evidenced thereby shall be primary and non-contributing with respect to any policies carried by the Landlord, and that any coverage carried by the Landlord shall be excess insurance." The mall also disregards the General Amendatory Endorsement discussed above indicating the additional insured coverage is limited to " 'personal injury' or 'property damage' arising out of (a) 'your work' or (b) premises or other property owned by or rented to you." Based on its selective editing, the mall concludes it is contractually entitled to primary coverage for the loss alleged in Swanson's action, meaning that the insurer is obliged to provide a defense and any other policies affording coverage to the mall are only excess policies.

The mall supports its contention with a single Illinois case, rather than the Ohio authority that governs interpretation of the policy provisions, which is reason for us to conclude the argument is waived. *Village of Riverwoods*, 276 Ill. App. 3d at 729, 658 N.E.2d at 1268. Nonetheless, we chose to address it. We cannot limit our consideration to a sentence clause which appears to favor the mall. Under Ohio law, we consider the insurance contract as whole and give effect to the apparent intent of the parties. *Currier v. Penn-Ohio Logistics*, 2010-Ohio-198, ¶56, 931 N.E.2d 129, 138. The mall's argument fails when section 11.01 of the lease is read in conjunction with the General Amendatory Endorsement discussed above which limits the mall's

coverage as an additional insured to liability arising out of LensCrafters' "work" and "operations or premises" at the shopping mall. Furthermore, the argument fails under the Illinois law the mall relies upon. The mall contends *Bieda* is analogous, but in that case, a tenant was contractually required to obtain additional insured coverage for its landlord with respect to "the demised premises" and the underlying plaintiff was injured while making a delivery to the demised premises. *Bieda v. Carson International*, 278 Ill. App. 3d 510, 511, 512 N.E.2d 102, 103 (1996). The issue addressed was whether the coverage was "primary" instead of contingent upon the exhaustion of some other policy. *Bieda*, 278 Ill. App. 3d at 512, 512 N.E.2d at 104. We do not reach the issue of whether there is primary or contingent coverage because a plain reading of the unedited lease indicates there is no coverage for the landlord/mall with regard to this particular loss.

The mall's final argument is based on the insurer's letter dated November 13, 2006, in which the insurer referred to the mall as an "additional insured" under the policy and agreed to provide a defense under a reservation of rights. The mall argues these statements resulted in waiver of any policy defenses. The letter consisted of three sections, the first stating:

> "We have received your tender of the defense of the Woodfield Mall in [the legal action captioned 'Estate of Swanson v. Woodfield Mall LLC']. Based on our review of the complaint, the contract between LensCrafters and the Mall and the Commercial Generality Liability policy issued to LensCrafters, we have determined that the allegations of the complaint create a potential for coverage for the Mall under the policy. As a result, we will provide a defense, subject to the

position outlined in this letter."

The second section was a summary of the Swanson complaint and the relevant portions of the insurance policy. The third section was the insurer's conclusion:

"The lease between the Mall and LensCrafters requires LensCrafters to provide additional insured status to the Mall. As a result, the Mall is an insured but only with respect to liability arising out of the premises leased to LensCrafters. We will only indemnify you for damages awarded for "bodily injury" for liability arising out of the premises leased to LensCrafters.

While we have attempted to address all of the coverage issues related to this claim, Liberty Mutual reserves all rights under applicable law and the policy. This letter should not be construed as a waiver or estoppel of any possible coverage defenses afforded by the policy or applicable law."

Under Ohio and Illinois law, waiver of an insurer's rights occurs unilaterally and does not require any prejudice to or detrimental reliance by the insured. *State Farm Mutual Automobile Insurance Co. v. Ingle*, 2008-Ohio-6726, ¶32, 904 N.E.2d 934, 938-39; *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 498, 475 N.E.2d 872, 877 (1985). Waiver consists of the insurer's intentional relinquishment of a known right. *Ingle*, 2008-Ohio-6726, ¶32, 904 N.E.2d at 938; *Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878. Waiver may be express or implied and arises from an affirmative act, word, conduct or knowledge. *Ingle*, 2008-Ohio-6726, ¶32, 904 N.E.2d at 938-39; *Brochu*, 105 Ill. 2d at 498, 475 N.E.2d at 877. Waiver cannot, however, expand coverage beyond the express terms of the insurance policy. *Hartory v. State Automobile Mutual*

*Insurance Co.*, 50 Ohio App. 3d 1, 3, 552 N.E.2d 223, 225-226 (1988).

The mall has waived its final contention on appeal by failing to cite Ohio authority. *Village of Riverwoods*, 276 Ill. App. 3d at 729, 658 N.E.2d at 1268 (failure to cite supporting authority results in waiver). Since it would belabor the point to address the argument under both Ohio and Illinois law, we choose to limit our analysis to Illinois authority which is factually similar. *Brochu* illustrates that an insurer may expressly reserve the right to deny coverage at a later date. *Brochu*, 105 Ill. 2d 486, 475 N.E.2d 872. In that case, an insurance claims manager accepted defense of a suit and stated that with respect to coverage there "doesn't appear to be any further question concerning coverage *at this time*.' " (Emphasis in original.) *Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878. Despite this cautious phrasing, the client would subsequently argue the claims manager had relinquished the right to deny coverage. *Brochu*, 105 Ill. 2d at 498, 475 N.E.2d at 878. Two weeks after the first letter was sent, the insurer's attorney sent a letter indicating the insurer was defending the suit without any admission of its liability under the policy; that it was reserving its right to rely on coverage exclusions known as "(n)" and "(o)," which concerned inadequacies in the insured's own work or product; and that the insured had the right to take over the management of the defense. *Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878. Even though there was a lag in the insurer's specific invocation of policy exclusions "(n)" and "(o)," the court determined it had not intentionally relinquished its right to rely on those exclusions. *Brochu*, 105 Ill. 2d at 499, 475 N.E.2d 878-79.

We fail to see how the current insurer's letter could be construed as waiver. This is a clearer case than *Brochu*, because here, rather than two letters separated by two weeks, there was

one letter in which the insurer spelled out the limits of its undertaking to defend the shopping mall and made clear it was not relinquishing its right to deny coverage at a later date. The insurer's acknowledgment that the shopping mall qualified as an "additional insured" under its tenant's policy was not an indication there was insurance coverage for the Swanson action. The insurer went on to state there was only "a potential of coverage for the Mall under the policy" and that it would defend the Swanson action "subject to the position outlined in this letter." It then specifically invoked the policy's limitation on coverage to "premises or other property owned by or rented to [LensCrafters]" and the policy's limitation on indemnification to "damages awarded for 'bodily injury' for liability arising out of the premises leased to LensCrafters." Furthermore, the insurer concluded by expressly "reserv[ing] all rights under applicable law and the policy" and cautioning the mall that it should not construe the letter as "waiver or estoppel of any possible coverage defenses afforded by the policy or applicable law." Four months later, the insurer filed the instant action seeking a judicial declaration of noncoverage due to the "premises" language quoted in the letter. Under these facts, we do not see how the insurer intentionally relinquished its right to deny coverage based on the "premises" policy language.

The circumstances differ from those described in cases cited by the mall, including *Mathis*, in which the insurer denied coverage on certain grounds (misrepresentation and arson) but then later tried to avoid coverage on other grounds (the timing of the insured's proof-of-loss form). *Mathis v. Lumbermen's Mutual Casualty Insurance Co.*, 354 Ill. App. 3d 854, 822 N.E.2d 543 (2004). We fail to see the relevance of *Heneghan*, in which the insurer acquiesced to the insured's decision to delay making a claim until a trial determined who was driving the car that

32

collided with the insured's car and subsequently tried to deny the delayed claim as untimely. *Heneghan v. State Security Insurance Co.*, 195 Ill. App. 3d 447, 552 N.E.2d 406 (1990). We also reject the mall's reliance on *Gray*, in which the insurer announced that its investigation was complete and showed there was coverage, but, nine months later, informed the claimant that the investigation and coverage determination were still underway, and shortly after that, concluded the investigation and denied coverage. *State Farm Mutual Automobile Insurance Co. v. Gray*, 211 Ill. App. 3d 617, 619, 570 N.E.2d 472, 474 (1991). The insurer could not explain why the first letter had been sent. *Gray*, 211 Ill. App. 3d at 620, 570 N.E.2d at 474. In the court's opinion, the first letter would have led the claimants to believe coverage was not in dispute and that the insurer intended to address questions of damages and liability as called for by the insurance contract. *Gray*, 211 Ill. App. 3d at 621, 570 N.E.2d at 475. In contrast to *Mathis*, *Henegahan*, and *Gray*, the present insurer consistently asserted the "premises" language and its right to coverage defenses.

In its reply brief, the mall cites *Gray*, 211 Ill. App. 3d 617, 570 N.E.2d 472, for the additional proposition that the insurer waived its policy defenses by not filing this declaratory judgment suit sooner. In a motion taken with the case, the insurer argues we should strike this argument and others because they are improperly raised for the first time in the reply. 210 Ill. 2d R. 341(h)(7) (the appellant's opening brief must contain an argument section and "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *Sylvester v. Chicago Park District*, 179 Ill. 2d 500, 507, 689 N.E.2d 1119, 1123 (1997) (citing Rule 341(e)(7), now Rule 341(h)(7), for the proposition that arguments introduced

in a reply brief are waived). Any issue raised for the first time in the reply brief has been disregarded. All other aspects of the motion to strike are denied.

Having considered and rejected all the mall's arguments, we affirm the judgment of the trial court in favor of the insurer.

Affirmed; motion taken with case denied.

CAHILL and R. GORDON, JJ., concur.