# Illinois Official Reports

## Appellate Court

---

*Windmill Nursing Pavilion, Ltd. v. Cincinnati Insurance Co.*,
2013 IL App (1st) 122431

---

| | |
|---|---|
| Appellate Court Caption | WINDMILL NURSING PAVILION, LTD., Individually and On Behalf of a Class of Similarly Situated Persons, Plaintiff-Appellant, v. CINCINNATI INSURANCE COMPANY and UNITHERM, INC., Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2431 |
| Filed | December 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a declaratory judgment action concerning the insurance coverage applicable to plaintiff's settlement of its underlying suit for defendant insured's violation of the Telephone Consumer Protection Act by sending unsolicited faxes to plaintiff, the trial court properly found that Ohio law applied to the policies issued by defendant insurer, because they were between an Ohio insured and an Ohio insurer and the differences between Illinois law and Ohio law would affect the outcome, the insurer's notice of the exclusion of coverage for the alleged violation in the renewal policy it issued was sufficient under Ohio law, and the faxes were not "product" or "work" that was covered under the "products-completed operations hazard" provision. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-10154; the Hon. Michael Hyman, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Anderson & Wanca, of Rolling Meadows (Brian J. Wanca, David M. Oppenheim, and Jeffrey A. Berman, of counsel), and Bock & Hatch, LLC, of Chicago (Phillip A. Bock, of counsel), for appellant. |
| | Cray Huber Horstman Heil & VanAusdal LLC, of Chicago (James K. Horst and Melissa H. Dakich, of counsel), and Julian Campbell Law Offices, of North Barrington (Julian C. Campbell, of counsel), for appellees. |
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion. |

## OPINION

¶ 1 Plaintiff Windmill Nursing Pavilion, Ltd., brought a class action against Unitherm, Inc., for sending unsolicited faxed advertisements to Windmill and the class members on several occasions. Windmill, Unitherm, and Unitherm's insurer, Cincinnati Insurance Company, eventually settled the class action case for $7 million, and Cincinnati agreed to provide an initial $3 million settlement fund from the insurance policies carried by Unitherm. Windmill subsequently brought a declaratory judgment action against Cincinnati, seeking recovery of the remaining amount, and both parties moved for summary judgment. Windmill appeals the circuit court's July 20, 2012, denial of its motion for summary judgment and grant of Cincinnati's cross-motion for summary judgment.

¶ 2                                                 BACKGROUND

¶ 3 Windmill filed a class action complaint in 2009 and an amended complaint in 2010, on behalf of itself and others similarly situated, against Unitherm, Inc., alleging that Unitherm violated the Telephone Consumer Protection Act of 1991 (TCPA) (47 U.S.C. § 227 *et seq.* (2006))[1] by sending unsolicited fax advertisements to Windmill on November 7, 2005,

---

[1]TCPA outlaws, among other things, sending unsolicited advertisements to fax machines and provides for $500 liquidated damages per violation. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶¶ 28, 33 (citing 47 U.S.C. § 227(b)(1) (2006)).

November 29, 2005, and April 25, 2006.[2] Windmill Nursing Pavilion, Ltd. v. Unitherm, Inc., No. 09 CH 16030 (Cir. Ct. Cook Co.). The class action complaint also brought claims for conversion and for violating the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq*. (West 2006)).

¶ 4        At the time Unitherm sent the faxes, it carried commercial general liability and umbrella liability insurance coverage through Cincinnati. The first policy at issue ran from April 7, 2003, to April 7, 2006 (the original policy), and the second policy at issue ran from April 7, 2006, to April 7, 2007 (the renewal policy). With respect to the commercial general liability coverage, both the original policy and the renewal policy carried a $1 million general aggregate limit, $1 million products-completed operations aggregate limit, and $1 million personal and advertising injury limit. Both policies also provided a $2 million commercial umbrella liability coverage limit. In addition, the renewal policy contained a modification which excluded coverage for "bodily injury," "property damage," or "personal and advertising injury" which arose out of "any action or omission" that violated the TCPA.

¶ 5        On September 20, 2010, Windmill, Unitherm, and Cincinnati entered into a settlement agreement resolving the class action. The agreement indicated that Windmill's investigation determined that Unitherm caused 52,763 advertisements to be successfully sent via facsimile to 21,802 people from November 7, 2005, to April 25, 2006. Unitherm denied all liability for the claims, but it and Cincinnati agreed to settle all claims between Windmill and the class. The parties agreed to a $7 million consent judgment against Unitherm, which was collectible from Cincinnati under the insurance policies. Cincinnati agreed to provide an initial settlement fund of $3 million, which represented the combined general aggregate and umbrella limits under the original policy. However, the settlement agreement also provided that Cincinnati's obligation to pay any further portion of the judgment balance would depend on the outcome of litigation regarding two "carved-out" issues, which were as follows:

> "(1) whether Cincinnati's notice of reduction in coverage to Defendant regarding the TCPA exclusion added to the 2006-07 [renewal] Policy was sufficient and by reason of the sufficiency of that notice whether the TCPA exclusion is thus valid or is null and void; and (2) whether the products-completed operations limit stated in the 2003-06 [original] Policy, or the products-completed operations limited stated in the 2006-07 [renewal] Policy, is available in addition to the general aggregate limits stated by those policies."

¶ 6        The circuit court in the underlying action granted final approval of the settlement agreement on December 17, 2010.

---

[2]Windmill indicated that the faxed advertisements from Unitherm, which were attached to the complaint, advertised Unitherm's iron-on garment label system. The faxed advertisement indicated: "ATTENTION LAUNDRY MANAGER"; "Iron On Garment Label System"; and "Everything You Need to Print And Apply Iron On Labels" for the price of $595. The advertisement also provided "Labels Won't Fade or Fall Off" and "100% Satisfaction Guaranteed" and offered "120 FREE labels with every purchase!"

¶ 7        Windmill initiated the instant declaratory judgment action against Cincinnati on March 11, 2010, and filed a first amended declaratory judgment complaint on December 23, 2010, seeking to resolve the carved-out issues.[3] Windmill maintained that the underlying TCPA claims regarding the faxed advertisements were covered under both the original and renewal policies. Windmill asserted that the exclusion for TCPA claims contained in the renewal policy was invalid because Cincinnati did not provide Unitherm with adequate notice of its insertion into the renewal policy. In addition, Windmill asserted that sending the unsolicited fax advertisements triggered not only the policies' commercial general liability and umbrella coverage, but also the "products-completed operations hazard" coverage, which Windmill asserted had a separate limit of $1 million that was available in addition to the general aggregate limit.

¶ 8        Windmill and Cincinnati filed cross-motions for summary judgment with respect to the two carved-out issues. The parties entered into a stipulation regarding the motions applicable to the circuit court and appellate proceedings pertaining to the motions for summary judgment, which indicated that resolution of three questions of law would allow them to reach a settlement agreement as to the carved-out issues:

"(a) Does the Completed Operations coverage in the 2003 [original] and 2006 [renewal] Cincinnati policies, afford coverage limits in excess of the stated Aggregate Limits of Liabilities in those policies?

(b) Did Cincinnati give notice of reduction of coverage to Unitherm compliant with the policy and Ohio law?

(c) Were claims based on the Ohio Change Endorsement[4] waived and released by the terms of the September 20, 2010, Settlement Agreement?"

¶ 9        The stipulation provided as follows:

"a) Whether the telefaxes described in the Plaintiff's complaint qualify under the terms of the Cincinnati Policies as the Insured's 'Work' or 'Product' shall be argued solely as a disputed question of law, and not as a disputed question of fact.

b) The parties will assume that Cincinnati mailed a copy of the Notice of Change contained within the 2006 Cincinnati Policy, on or about April 7, 2006.

c) The parties will assume that the Notice of Chance contained within the 2006 Cincinnati Policy was the only notice Cincinnati provided directly to Unitherm.

d) The parties will assume that Cincinnati alerted Unitherm's insurance agent that all future renewal policies for all insured would contain an exclusion of TCPA claims shortly following the approval of that exclusion by the Ohio Department of Insurance, and will assume that Cincinnati sent the agent a copy of Unitherm's renewal policy,

---

[3]Windmill's initial complaint listed Cincinnati and Unitherm as defendants, but its amended complaint listed only Cincinnati.

[4]The Ohio change endorsement refers to a provision of the policy pertaining to the time requirements for providing notice of cancellation or nonrenewal of the policy.

- 4 -

which contained the Notice of Change, on or about April 7, 2006, but will further assume that Cincinnati did not otherwise send the agent a separate copy of the Notice of Change in connection with Unitherm's policy renewal.

e) The parties will assume that the question of Cincinnati's compliance with the Ohio Change Endorsement was not specifically discussed by the parties as a source for Cincinnati's notice of reduction in coverage requirements in negotiating the terms of the September 20, 2010, Settlement Agreement."[5]

¶ 10    Based on these stipulations, Windmill argued that Cincinnati failed to provide adequate notice of the TCPA exclusion in the renewal policy, the insertion of the exclusion provision operated as a nonrenewal, and the exclusion was invalid. Windmill also reiterated its argument that additional coverage for the underlying claims existed under the "products-completed operations hazard" provisions of the policies. The "products-completed operations hazard" was defined as " 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.' " Windmill argued that the faxed advertisements constituted "goods" or "products," they were materials distributed as part of Unitherm's operations, they made representations regarding quality, and they caused property damage, *i.e.*, physical injury to tangible property such as fax toner and paper, and loss of use of tangible property, *i.e.*, the loss of use of telephones during fax transmissions. Windmill asserted that the general aggregate limits and the products-completed limits of both the original and renewal policies were separate limits and all were applicable because the underlying claims fell under both types of coverage.

¶ 11    In Cincinnati's cross-motion for partial summary judgment, it maintained that it was not obligated to pay more than the $3 million aggregate limit of liability under the original policy. Cincinnati asserted that Ohio law should apply to the notice issue and that its notice of the TCPA exclusion in the renewal policy was adequate under Ohio law. Therefore, the TCPA exclusion was valid and enforceable and no coverage was available under the renewal policy. With respect to the products-completed operations hazard coverage, Cincinnati argued that the products-completed operations limit was not an independent and supplemental limit of the available coverage for Windmill's claims because the general aggregate limit of the policy necessarily meant the "sum total" of available coverage payable by the insurer. Cincinnati also maintained that the faxed advertisements did not constitute Unitherm's "work" or "product" which would trigger the products-completed operations hazard coverage.

¶ 12    In a July 20, 2012, written opinion and order, the circuit court denied Windmill's motion for summary judgment, granted Cincinnati's cross-motion for summary judgment, and granted judgment in favor of Cincinnati on Windmill's declaratory judgment action. The circuit court's order indicated that this "dispose[d] of this matter completely." The circuit court determined that Ohio law applied because the policies were executed and delivered in Ohio, were between an Ohio insured and insurer, no other state had a rational relationship to the policies, and the differences between Illinois and Ohio law were substantive and would affect the outcome of

___

[5]The parties reserved the right to pursue discovery and litigation of all disputed questions of fact after resolution of the motions for summary judgment.

the case. The circuit court also held that the release in the settlement agreement did not preclude the parties from litigating the carved-out issues.

¶ 13 With respect to the notice of the TCPA exclusion, the circuit court held that Windmill's reliance on law relating to nonrenewal situations was irrelevant because the instant case was not a "nonrenewal" case. The court indicated that under Ohio law, notice of changes in a renewal the policy must be separately attached and clearly worded. The court held that the notice provided with the renewal policy in the present case complied with Ohio law; it was a separate page, attached to the policy, and was clearly worded regarding the change in coverage. Also, because the underlying and umbrella policies were "bound together and share[d] the same policy number, the notice was sufficient for both." Thus, the circuit court held that there was no coverage available under the renewal policy.

¶ 14 Regarding the issue of coverage under the products-completed operations hazard provision, the circuit court held that this provision contained a limit of $1 million and that it was separate from, and in addition to, the coverage provided under the general aggregate limit. However, the circuit court held that the products-completed operation hazard coverage was inapplicable to the present case because the faxed advertisements were advertisements about Unitherm's goods or products and did not constitute Unitherm's "goods" or "products" themselves. The court observed that Windmill acknowledged in its complaint that the faxes were advertisements. Further, the fact that the advertisements contained representations as to the quality of Unitherm's product was irrelevant because Windmill did not bring a claim against Unitherm alleging breach of implied or express warranty.

¶ 15 Following the circuit court's order, Windmill appealed to this court pursuant to Illinois Supreme Court Rule 303 (eff. May 30, 2008). Windmill raises two main issues on appeal: (1) whether the reduction of coverage notice regarding the TCPA exclusion in the renewal policy was adequate; and (2) whether there was separate coverage under the products-completed operations hazard provision in the policies that would be available in addition to the coverage under the general aggregate limit.

¶ 16                                                    ANALYSIS
¶ 17                                              I. Standard of Review
¶ 18 "[S]ummary judgment is proper only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49 (citing 735 ILCS 5/2-1005(c) (West 2000)). As summary judgment is a drastic measure, the moving party's right must be "clear and free from doubt." *Id.* The court strictly construes the pleadings, depositions, admissions, and affidavits against the movant and liberally in favor of the opponent. *Id.* "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* (citing *Adames v. Sheahan*, 233 Ill. 2d 276, 296 (2009)). "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Our standard of review is *de novo*. *Id.*

¶ 19    This case also requires this court to interpret the language of an insurance policy. "Because an insurance policy is a contract, the rules applicable to contract interpretation govern the interpretation of an insurance policy." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). Our primary objective is to give effect to the intent of the parties. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006). We construe the policy as a whole and give effect to every provision, if possible. *Id.* Unambiguous words are given their plain, ordinary meaning. *Id.* at 363.

> "A policy provision is not rendered ambiguous simply because the parties disagree as to its meaning. [Citation.] Rather, an ambiguity will be found where the policy language is susceptible to more than one reasonable interpretation. [Citations.] While we will not strain to find an ambiguity where none exists [citation], neither will we adopt an interpretation which rests on 'gossamer distinctions' that the average person, for whom the policy is written, cannot be expected to understand [citation]." *Founders Insurance Co.*, 237 Ill. 2d at 433.

¶ 20    We review the construction of an insurance policy *de novo* as it presents a question of law. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993).

¶ 21                                    II. TCPA Exclusion
¶ 22                                     A. Choice of Law
¶ 23    In the present case, the circuit court held that there were substantive differences between Illinois and Ohio law regarding notice requirements and that Ohio law should be applied. "This court needs to determine which jurisdiction's law applies only when 'a difference in law will make a difference in the outcome.' " *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2013 IL App (1st) 121920, ¶ 17 (quoting *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007)).

¶ 24    "Under Illinois choice-of-law rules for insurance contracts, Illinois courts use the 'most significant contacts' test." *United Farm Family Mutual Insurance Co. v. Frye*, 381 Ill. App. 3d 960, 965 (2008). "Pursuant to this test, insurance policy provisions are 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.' " (Internal quotation marks omitted.) *Westchester Fire Insurance Co. v. G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 628-29 (2000) (quoting *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 526-27 (1995)).

¶ 25    Pursuant to section 143.17a of the Illinois Insurance Code, when an insurer intends to renew an insurance policy that involves "changes in deductibles or coverage that materially alter the policy," the insurer must provide the insured with written notice of the change "at least 60 days prior to the renewal or anniversary date" and also retain proof of mailing the notice.

215 ILCS 5/143.17a(b) (West 2008).[6] If the insurer fails to comply with this requirement, it "must renew the expiring policy under the same terms and conditions for an additional year or until the effective date of any similar insurance is procured by the insured, whichever is earlier." 215 ILCS 5/143.17a(c) (West 2008).

¶ 26    In contrast, although Ohio has statutory notice requirements applicable in other circumstances, there is no statutory requirement regarding notice of a change in coverage in a renewal policy. See Ohio Rev. Code Ann. § 3937.27 (West 2008) (requiring 30 days' notice to insured where renewal is conditioned on a substantial increase in premium); Ohio Rev. Code Ann. § 3937.26 (West 2008) (requiring 30 days' notice of insurer's intention not to renew a policy). Under Ohio common law, an insured is entitled to adequate notice of a material change in the terms of an insurance contract; absent this notice, the insured is entitled to assume that the renewal policy contains the same terms as an original policy. *Allstate Insurance Co. v. Zampedro*, No. 3247, 1983 WL 6040, at *2 (Ohio Ct. App. Dec. 30, 1983). However, "knowledge of material change will be imputed to [an insured] if actual notice is provided through a 'separately attached and clearly worded letter describing the modifications.' " *MDC Acquisition Co. v. North River Insurance Co.*, 898 F. Supp. 2d 942, 951 (N.D. Ohio 2012) (quoting *Zampedro*, 1983 WL 6040, at *2, and citing *Allstate Insurance Co. v. Croom*, 2011-Ohio-1697, at ¶¶ 12-15 (Apr. 7, 2011)).

¶ 27    Cincinnati concedes that it did not meet the notice requirements under Illinois law with respect to the TCPA exclusion, but it contends that it provided sufficient notice under Ohio common law. Windmill argues that there is no conflict in law because the material alteration in the second policy constituted a nonrenewal, and Cincinnati was required to give Unitherm 30 days' notice under the law of either state.

¶ 28    We agree with the circuit court that an outcome-determinative conflict exists between Illinois and Ohio law. We also agree that this case is not a nonrenewal case, but rather a renewal case wherein the renewal policy contained a modified term regarding one aspect of coverage. Windmill's reliance on law and a provision in the policy pertaining to nonrenewal situations is inapposite. Further, we also agree with the circuit court's conclusion that Ohio law applies. The insurance policies at issue were executed and delivered in Ohio, the policy was between an Ohio insured and insurer, and Ohio had the most significant contacts with the policies and the insured and insurer. Under Ohio law, Cincinnati had to provide a separately attached, clearly worded notice regarding the modification of coverage in the renewal policy.

¶ 29                                      B. Notice

¶ 30    We next turn to the adequacy of the notice provided by Cincinnati to Unitherm regarding the exclusion of TCPA coverage in the renewal policy. Windmill contends that Cincinnati's notice was inadequate because it was late, it was not "separately attached," and it did not apply

---

[6]A "material alteration" is one that "makes significant changes to that policy." *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141, 153 (2003). On appeal, the parties do not dispute that the TCPA exclusion constituted a material alteration.

to the umbrella policy. Cincinnati argues that it provided adequate notice in three documents, which were all on separate pages, bold-faced, and in capital letters.

¶ 31    As stated, under Ohio law, unless an insurer notifies the insured of a material change in the terms of a renewal policy, the insured is not bound by new and more onerous terms where he had no knowledge and did not consent. *Zampedro*, 1983 WL 6040, at *1-2 (citing *River Services Co. v. Hartford Accident & Indemnity Co.*, 449 F. Supp. 622 (N.D. Ohio 1977)). If the insurer fails to provide adequate notice of the modifications, an insured "is justified in assuming the renewal policy is the same as the prior policy." *Id.* at *2 (citing *Thomas v. Connally*, 332 N.E.2d 87 (1974)). In *Zampedro*, the notice was inadequate where the insurer merely sent the renewal policy and renewal slip, without more. *Id.*

    "Under Ohio law, an insurance company does not give an insured actual notice of a change in coverage by merely sending the policy alone, or with instructions to read the policy carefully. [Citations.] Instead, Ohio courts, following, the 10th Circuit ruling in [*Government Employees' Insurance Co. v. United States*, 400 F.2d 172 (10th Cir. 1968)], have held that sending an endorsement as a 'short, separately attached boldly worded modification,' accomplishes actual notice to the insured. [*Government Employees' Insurance Co.*, 400 F.2d at 175], *** *Zampedro*, 1983 WL 6040 *2 *** (citing [*Government Employees' Insurance Co.*] and stating 'a separately attached and clearly worded letter describing the modifications would be more adequate'), *** *Croom*, 2011 WL 1327425 ¶ 12-¶ 15 *** (citing [*Government Employees' Insurance Co.*] and holding that a notice sent on a separate piece of paper using bold type and capital letters is sufficient to give actual notice to the insured)." *MDC Acquisition Co.*, 898 F. Supp. 2d at 952.

¶ 32    In *MDC Acquisition Co.*, the court held that the insurer's notice was sufficient under Ohio law where it was on separate paper and used boldfaced type and capital letters, and even went further than Ohio law required by "using a separate mailing and attaching the short, clear endorsement itself." *MDC Acquisition Co.*, 898 F. Supp. 2d at 952. See also *Croom*, 2011-Ohio-1967, at ¶¶ 12-16 (holding that notice to insured is sufficient if it was "presented in such way as to call attention to any material change in the terms of the contract," and that "notice is sufficient if it is provided in 'a separately attached and clearly worded letter describing the modifications' " (quoting *Zampedro*, 1983 WL 6040, at *2)). In *Croom*, notice was adequate under circumstances where the insurer provided a separately attached notice in bold, capital letters and large font advising the insured of the new exclusion of coverage for lead exposure injuries, and the insured did not dispute that he received the notice and he continued paying the premiums for several years. *Id.* ¶¶ 13-15. Also see *Government Employees' Insurance Co.*, 400 F.2d at 175 (indicating that an insured would be sufficiently notified where the renewal policy was transmitted with instructions to the insured to read it carefully and it also contained an endorsement regarding the modification which was short, separately attached, and boldly worded).

¶ 33    In the present case, the renewal policy contained a separate endorsement page, which provided in bold, capital, enlarged letters:

"**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXCLUSION–VIOLATION OF STATUES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2., Exclusions of Section I–Coverage A–Bodily Injury and Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

'Bodily injury' or 'property damage' arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; \*\*\*

\* \* \*

**B.** The following exclusion is added to Paragraph **2., Exclusions of Section I –Coverage B–Personal and Advertising Injury Liability:**

2. Exclusions

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

'Personal and advertising injury' arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendments of or addition to such law[.]"

¶ 34    In addition, a notice was also included. It was in bold, capital letters, and on a separate sheet of paper:

"**GENERAL LIABILITY**

**NOTICE TO POLICYHOLDERS–EXCLUSION–**

**VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION**

This Notice does not form part of your insurance contract. The Notice is designed to alert you to coverage changes when the exclusion for violation of statutes that govern e-mails, fax phone calls or other methods of sending material or information is attached to this policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply. Please read your policy, and the endorsement attached to your policy, carefully.

This notice contains a brief synopsis of the following endorsement:

• CG 00 67 03 05–Exclusion–Violation of Statutes That Govern E-mails, Fax, Phone Calls or Other Methods of Sending Material or Information

- 10 -

When the above referenced endorsement is attached to your policy, coverage is excluded for bodily injury and property damage under Coverage A and personal and advertising injury under Coverage B, arising directly or indirectly out of any action or omission that violates or is alleged to violate the Telephone Consumer Protection Act (TCPA), the CAN-SPAM Act of 2003 (including any amendment of or addition to such laws), or any other statute, ordinance or regulation that prohibits or limits the sending, transmitting, or communicating or distribution of material or information.

This is a reduction in coverage in states where, absent the wording of this endorsement, courts would consider coverage to be provided for violations of the above-mentioned acts or of other similar statues, regulations or ordinances."

¶ 35     There was also another endorsement page included several pages later which pertained to the umbrella policy:

**"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXCLUSION–VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION**

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART–**
**CLAIMS-MADE**

**SECTION I–COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to:
**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**
Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:
a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law[.]"

¶ 36     Considering these notification forms and endorsements, we conclude that Cincinnati provided sufficient notice to Unitherm regarding the TCPA exclusion in the renewal policy. As the circuit court held, these forms were "separately attached" because they were on separate, individual pages attached to the renewal policy. Further, the forms were clearly worded, and they were in large, bold, capital letters. They specified that they related to the umbrella coverage and the commercial general liability coverage. Cincinnati did not merely send the policy alone or with instructions to "carefully read the policy." Accordingly, we find that Cincinnati's notice was adequate under Ohio law. *MDC Acquisition Co.*, 898 F. Supp. 2d at 951-52. Moreover, although Windmill argues that Cincinnati was required to provide 30 days' notice, Windmill relies on an Ohio statute which applies to nonrenewal situations where an insurer decides not to renew a policy at all. See Ohio Rev. Code Ann. § 3937.26 (West 2008).

As stated, this case did not involve a nonrenewal of an insurance policy.

¶ 37                    III. "Products-Completed Operations Hazard" Coverage

¶ 38      Windmill next argues on appeal that separate coverage was available under the "products-completed operations hazard" provision of the insurance policies, in addition to the coverage available under the commercial general liability and umbrella coverages. Windmill reasons that the faxed advertisements constituted Unitherm's "goods" or "products" which made representations or warranties regarding the quality of its labeling system and were distributed in connection with Unitherm's operations. Windmill additionally argues that the products-completed operations hazard limit of $1 million was separate from, and in addition to, the general aggregate limit of $3 million. Cincinnati argues that Windmill is not entitled to any coverage under the products-completed operations hazard provision because the advertisements did not constitute Unitherm's "goods" or "products," and the products-completed operations hazard limit was subsumed under the general aggregate limit.

¶ 39      The circuit court held that the coverage available under the products-completed operations hazard was separate and in addition to the coverage under the aggregate limit, but it was not available in this case because the advertisements did not constitute Unitherm's "product" or "work" under this provision.

¶ 40      Initially, we hold that, based on our resolution of the previous issue regarding notice, coverage under the products-completed operations hazard provision in the renewal policy was not available because of the valid TCPA exclusion, regardless of whether the faxed advertisements constituted Unitherm's "work" or "product." We therefore focus our analysis on only the original policy.

¶ 41      The "products-completed operations hazard" coverage provision provides as follows:

"19. 'Products-completed operations hazard':

a. Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned."

¶ 42      The policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by *** [y]ou." This includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.' " The policy also defines "your work" as "(1) [w]ork or operations performed by your or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." This also includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.' "

¶ 43      We agree with the circuit court's determination that the faxed advertisements did not constitute Unitherm's "products," "goods," or "work" under the policy. The faxes were not Unitherm's goods or products and they did not constitute its work or operations, and they were not materials, parts, or equipment furnished in connection with its operations. It is undisputed

that Unitherm was not in the business of selling the advertisements themselves. Rather, the faxes were advertisements meant to solicit orders for Unitherm's products, *i.e.*, its iron-on label system. As such, the faxes clearly fell under the definition of "advertisements" set forth in the policy: "a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. 'Advertisement' includes a publicity article." The faxes at issue in this case were notices dispersed to the public regarding its goods and products "for the purpose of attracting customers." Because the faxed advertisements did not come within the products-completed operations hazard coverage, the $1 million "products-completed" limit is therefore unavailable to Windmill.

¶ 44    In addition, we note that in Windmill's complaint, its claims regarding TCPA violations acknowledged that the faxes were advertisements. Despite Windmill's argument that the products-completed operations hazard coverage applied because the advertisements made representations regarding Unitherm's products, Windmill's TCPA violation claims did not arise out of any representations or warranties and Windmill made no assertions that any representations or warranties were false or caused property damage. Although Windmill cites *Cobbins v. General Accident Fire & Life Insurance Corp.*, 53 Ill. 2d 285, 287, 292 (1972), in arguing that product hazard coverage in insurance policies is broad and applies to all product-related injuries, that case nonetheless involved the *product* of the insured (the insured store allegedly negligently sold sparklers to an underage person, who was injured by them off-site).

¶ 45    Windmill urges that any ambiguity must be resolved in favor of coverage. However, we decline to find that the terms "your product" and "your work" are ambiguous, as they are clearly defined by the plain language of the policy. Moreover, as stated, the policy also set forth the definition of "advertisement," which unquestionably encompassed the faxed advertisements at issue. An insurance policy is not rendered ambiguous merely because the parties disagree as to its meaning, and we "will not strain to find ambiguity where none exists." *Founders Insurance Co.*, 237 Ill. 2d at 433.

¶ 46    In light of our finding that the fax advertisements were not "products" resulting in coverage under the products-completed operations hazard provisions, we find it unnecessary to determine whether the products-completed operations provision would provide coverage in addition to that provided by the advertising injury provision. We note, however, that the presence of an antistacking provision and its effect on this question was not discussed by the circuit court. The circuit court's order stated that Windmill noted that there was no antistacking provision. However, the parties point to no place in the record where that claim was made.

¶ 47    In addition, the Illinois Supreme Court has determined that antistacking clauses do not violate public policy and unambiguous antistacking provisions in insurance policies are enforceable. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17-18 (2005). On appeal, Windmill acknowledges the existence of the antistacking clause, but claims that its terms are byzantine in nature and do not apply in this context. In that regard, we note that the antistacking clause in the policy, which was cited by Cincinnati, merely provides that

coverages from different parts or forms cannot be stacked.[7] Windmill contends that it is not stacking coverage under more than one coverage part. Our review of the policy in question reveals that the personal and advertising injury coverage and the products-completed operations hazard coverage appear within the same coverage part, the commercial general liability part. We further note that, on appeal, Windmill string cites several cases for the proposition that coverage is available under both provisions. However, as Cincinnati points out, none of the cited cases discuss antistacking provisions or their applicability in circumstances similar to the instant case.

¶ 48                                      CONCLUSION

¶ 49        For the reasons stated above, we affirm the circuit court's order granting Cincinnati's partial motion for summary disposition and denying Windmill's motion for summary disposition, and granting judgment in favor of Cincinnati and against Windmill on Windmill's declaratory judgment complaint.

¶ 50        Affirmed.

---

[7]The antistacking clause provided as follows:

"If this Coverage Part and any other Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same 'occurrence' or 'personal and advertising injury' offense, the aggregate maximum limit of insurance under the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable limit of insurance under any one Coverage Form, Coverage Part or policy. This condition does not apply to any Coverage Form, Coverage Part or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Part."